### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| DONNA SIMLER, | |
| *Plaintiff,* | Civil Action No. |
| v. | 3:02 CV 01565 (JCH) |
| EDWARD STRUZINSKY and BRANFORD BOARD OF EDUCATION | |
| *Defendant*s. | JANUARY 16, 2004 |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56 and D.Conn.L.R. 56, the defendants, EDWARD STRUZINSKY and BRANFORD BOARD OF EDUCATION, submit the following Memorandum of Law in support of their Motion for Summary Judgment dated January 16, 2004. References to exhibits within this document refer to the exhibits attached to the defendants' Local Rule 56 Statement dated January 16, 2004 of material facts not in dispute.

### I.    STATEMENT OF FACTS.

By way of complaint dated September 3, 2002 and filed September 4, 2002, the plaintiff, Donna Simler, commenced an action against the Town of Branford Board of Education (the "Board of Education") and Edward Struzinsky, a member of the Board of Education from November 1991 until November 2003, and its Chairman from November 1997 until November 1999. Chairman Struzinsky is sued in is individual capacity only. The Town of Branford Board of Education (the "Board of Education"), a municipal corporation organized and existing under the laws of the State of Connecticut is named as a defendant in this action.

The defendants incorporate by reference the Local Rule 56 statement as if fully set forth herein.

## A.     BACKGROUND.

On May 15, 1998, Simler allegedly assaulted an ex-boyfriend.  She was arrested and was immediately suspended by the Branford Board of Education.  Thereafter, the Branford Board of Education conducted an independent investigation.  It hired separate counsel to conduct such investigation. ***See* Exhibit B, Att. 1.** On September 2, 1998, as a result of the investigation, Simler was informed that the school system would commence termination proceedings against her.  In lieu of the termination proceedings, the parties entered into a separation agreement. ***See* Exhibit B, Att. 3.** The separation agreement called for Simler to be placed on paid leave through January 31, 1999. From February 1, 1999, through June 30, 1999, Simler was placed on unpaid leave. Simler was required to and did submit an irrevocable letter of resignation effective June 30, 1999, upon executing the separation agreement on November 12, 1998. ***See* Exhibit B, Att. 4.**

The separation agreement required that the Branford Board of Education pay Simler's contribution to the Teachers' Retirement Board ("TRB") from February 1, 1999, through June 30, 1999.  The agreement indicated:  "Under no circumstances shall the Board pay the teacher's TRB contribution after June 30, 1999." Additionally, the separation agreement stated:

> Teacher acknowledges and agrees that she is voluntarily resigning her employment with the Board in accordance with this Agreement.  The teacher agrees that other than the provisions set forth in this Agreement, no further monies, salary or compensation whatsoever will be paid to the teacher or are owed to the teacher by the Board, including its present or former agents, employees, attorneys, commissioners, elected or appointed officials.

On March 24, 1999, the Branford Board of Education approved an "Ohio-plan" early retirement incentive for all eligible professional staff, providing for the purchase of an additional three years of service for those who chose to take advantage of the

incentive and consistent with the statutes and regulations established by the legislature and the TRB for the type of program.

On March 26, 1999, Assistant Superintendent Dr. Paul Smotas, issued a memorandum to all teachers and administrators concerning the Ohio-plan. ***See* Exhibit A, Att. 1.** The memorandum indicated that the Branford Board of Education would purchase three years of additional service for all teachers/administrators who qualify for the plan.  Qualification or eligibility is based upon age (attainment of age 50 prior to July 1, 1999) and participation limits imposed by the Branford Board of Education.  (School boards may limit the number of employees for whom it will purchase service to a specific percentage of the work force based upon service in Branford.)  It informed the teachers/administrators that they had until May 27, 1999 to apply.  The notice further indicated that once all applications had been received, the Branford Board of Education will determine the percentage of teachers/administrators who will be approved under the retirement plan.

Simler submitted an application for the early retirement plan.  On June 1, 1999, the Branford Board of Education approved the early retirement plan to the 16 most senior teachers with Branford experience who applied. **Exhibit D.** Simler was allegedly the only applicant denied early retirement benefits. On June 2, 1999, Dr. Smotas notified Simler that the 16 most senior teachers who applied were accepted and her level of experience did not meet the criteria for approval. ***See* Exhibit B, Att. 2.**

In the beginning of September 1999, the Branford Board of Education voted to seek revocation of Simler's teaching certificates.  Mr. Edward Struzinsky, as Chairman of the Branford Board of Education, signed the request to revoke on the basis of her assault, flight from the assault and arrest for assault.  Dr. Storm, Superintendent of Schools, submitted the investigative materials from the Branford Board of Education to the Commissioner of Education. ***See* Exhibit B, Att. 1.** Thereafter, the Commissioner began an investigation.  **Exhibit E.**

On January 10, 2001, the Connecticut Board of Education found probable cause to institute revocation proceedings against Simler and referred the matter to a hearing

officer to conduct the necessary hearings and issue a proposed decision.  After five dates of hearings and numerous post-hearing briefs submitted by the Commissioner and Simler, the hearing officer issued his proposed decision on December 19, 2001. *See* **Exhibit E.**

The Hearing Officer's decision indicates that the hearing officer's proposed decision granted the first count of the administrative complaint finding Simler professionally unfit to perform her duties in accordance with Connecticut General Statutes §10-145b(m) and on the second count finding Simler unqualified to possess a certificate for other due and sufficient cause in accordance with Connecticut General Statutes §10-145b(m).  The third count found Simler unqualified to possess a certificate for other due and sufficient cause in accordance with violation of §10-145d-400a(c)(1)(A) of the Regulations of Connecticut State Agencies which states:  "The professional teacher, in full recognition of his or her obligation to the profession of teaching, shall conduct himself as a professional realizing that his or her action reflects directly upon the status and substance of the profession."  The fourth count found Simler unqualified to possess a certificate for other due and sufficient cause in accordance with of §10-145d-400a(c)(2)(C) which states:  "The professional teacher, in full recognition of his or her obligation to the profession of teaching, shall not engage in any misconduct which would impair his or her ability to teach."  The fifth count found Simler unqualified to possess a certificate for other due and sufficient count in accordance with §10-145d-400a (c)(1)(D) of the Regulations of Connecticut State Agencies which states:  "The professional teacher, in full recognition of his or her obligation to the teaching professional shall strive to exercise the highest level of professional judgment.  After a public hearing on February 6, 2002, the Connecticut Board of Education adopted proposed decision and all of Simler's Connecticut teaching certificates were revoked. *See* **Exhibit E.**

On February 26, 2002, Simler moved for reconsideration of the Connecticut Board of Education's revocation of her teaching certificates.  On March 6, 2002, the Connecticut Board of Education granted the petition for reconsideration limited to the grounds that the decision was based upon allegations not contained in the

administrative complaint and that the facts did not bear upon the allegations contained in the administrative complaint.  The Connecticut Board of Education indicated that the Commissioner should file a revised administrative complaint and the matter was remanded to the hearing officer for the limited purpose of conducting additional proceedings related to any new allegations. *See* **Exhibit E.**

The Commissioner filed an amended complaint adding additional counts specifying from 1993 through 1998 that Simler engaged in confrontational conduct with students and parents, as well as engaged in continued in-school and out-of-school confrontational conduct.  The complaint alleges that such conduct demonstrates that Simler was unqualified to possess a teaching certificate and she was professionally unfit to perform her duties; failed to conduct herself as a professional realizing that her actions reflected directly upon the status and substance of the profession; engaged in conduct which would impair her ability to teach; and failed to recognize respect and uphold the dignity and worth of students as individual human beings. *See* **Exhibit E.**

On December 16, 2002, the hearing officer entered his supplemental finding of facts and recommended decision.  The hearing officer found that the only evidence offered by Simler concerning her actions concerning the assault of her former boyfriend was that her not guilty verdict was evidence of "exoneration of any claim of striking him." The hearing officer's supplemental finding of facts was that no changes were warranted concerning the assault from his previous decision.  Additionally, the hearing officer's supplemental finding of facts found that the evidence submitted by Simler did not warrant a change of any finding of facts concerning her confrontational dealings with students.  The hearing officer particularly noted that "if anything, her testimony, especially under cross- examination, demonstrated a confrontational attitude."  The hearing officer found as additional facts only that Simler entered into a separation agreement, voluntarily and irrevocably resigned her position and submitted her retirement papers on June 29, 1999. *See* **Exhibit E.**

The hearing officer noted that the new allegations raised in the revised administrative complaint fully conformed to the evidence that was already submitted

resulting in the finding of fact and recommended decision previously submitted to the Connecticut Board of Education.  The hearing officer did note that if he was simply presented with the allegations that Simler was not dealing "justly and considerately with students," he indicated that such conduct would not warrant revocation of her teaching certificate, but could justify termination from a specific school system.  However, as the hearing officer already found that the assault was justification for the revocation of her teaching certificate, he again recommended the decision that her certificate be revoked. On February 5, 2003, the Connecticut Board of Education again voted to revoke her teaching certificates. ***See* Exhibit E.**

> **B.    SIMLER'S LAWSUIT.**

Based on the foregoing, Simler commenced a lawsuit in United States District Court for the District of Connecticut claiming her federal constitutional rights were violated. In particular, Simler claimed that her procedural and substantive due process rights were violated as well as her right to the equal protection of the laws, all guaranteed to her by the Fourteenth Amendment to the United States Constitution.

Specifically, Simler claims that she was excluded from the early retirement incentive plan and that a request to have her teaching certificate revoked. Simler also claims that the Branford Board of Education failed to withdraw the request for revocation after she was found not guilty of assaulting her ex-boyfriend.

The defendants now move for summary judgment on the plaintiff's complaint. They submit that no questions of material fact exist that Simler fails to state a claim upon which relief may be granted and that Chairman Struzinsky is protected by the doctrine of qualified immunity. Chairman Struzinsky is also protected by the doctrine of legislative immunity. Moreover, any claims pertaining to the request to revoke Simler's teaching certificate is barred by the First Amendment and the absolute privilege to participate in a quasi-judicial proceeding. Additionally, any claims concerning Simler's entitlement to retirement benefits are barred by the statute of limitations and the terms and conditions of her settlement agreement with the Branford Board of Education.

## II.    LAW AND ARGUMENT.

### A.    STANDARD OF REVIEW.

Fed.R.Civ.P. 56(c) requires the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A factual dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A "material fact" is one whose resolution will affect the ultimate determination of the case.  Id.  In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences against the moving party.  Id. at 255, 106 S.Ct. at 2513; J.F. Feeser, Inc. v. Servi-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990), cert. denied, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).  However "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Samuels v. Smith, 839 F.Supp. 959, 962 (D.Conn. 1993).

The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256, 106 S.Ct. 1570, 94 L.Ed.2d 763 (1987); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980).  Thus, once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, and answers to interrogatories in order to demonstrate specific material facts which give rise to a genuine issue.  Celotex Corp. V. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed. 25 (1986). "Neither courts nor defendants should be

subjected to trials which can be little more than harassment." Applegate v. Top Associates, Inc., 425 F.2d 92, 96 (2d Cir. 1970).

When Rule 56(e) shifts the burden of proof to the non-moving party, that party must produce evidence to show the existence of every element that it bears the burden of proving at trial. Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp., 812 F.2d 141, 144 (3d Cir. 1987). Where evidence is submitted in support of, or in opposition to, a motion for summary judgment, such evidence must be presented in a manner consistent with its admissibility at trial. *See* First National Bank of Clinton, Ill. v. Insurance Co. of North America, 606 F.2d 760 (7th Cir. 1979) (in ruling on summary judgment motion, the district court properly relied on documents and exhibits identified by affidavit). Unsworn statements of the parties, letters addressed to litigants from third persons, and hearsay which does not fall under one or more of the exceptions listed in Rules 803-805 of the Federal Rules of Evidence, may not properly be considered. *See* Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Beyene v. Coleman Security Services, Inc., 854 F.2d 1179 (9th Cir. 1988); Edward B. Marks Music Corp. V. Stasny Music Corp., 1 F.R.D. 720 (S.D.N.Y. 1941).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-23. *Accord,* Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d. Cir. 1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim). *See also* Schacht v. Wisconsin Dep't of Corrs., 175 F.3d 497, 503-04 (7th Cir. 1997) (noting summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of act to accept its version of events"); *rev'd on other grounds*, 524 U.S. 381 (1998).

**B.    BASED UPON THE UNDISPUTED MATERIAL FACTS,
PLAINTIFF'S DUE PROCESS/EQUAL PROTECTION CLAIM
CONCERNING PARTICIPATION IN THE OHIO PLAN IS
BARRED BY THE STATUTE OF LIMITATIONS AS A MATTER
OF LAW.**

In essence, Simler claims that the defendants conspired to deprive her of benefits under an early retirement benefits despite the fact that said Plan was offered after Simler had already submitted an irrevocable letter of resignation in connection with a settlement agreement to avoid immediate termination. Simler claims that her exclusion from the Plan violated her Procedural Due Process, Substantive Due Process and Equal Protection rights, all guaranteed to her by the United States Constitution. Based on the undisputed facts, Simler's claims in this regard are expressly barred by the applicable statute of limitations.

As Simler's constitutional claims are enforced through 42 U.S. §1983, we first look to federal law to determine the applicable statute of limitations. Wilson v. Garcia, 471 U.S. 261, 266-80 (1985) (length of limitation period and related questions of tolling and application are also governed by state law). Conn. Gen. Stat. §52-577 "is applicable to all tort actions other than those excepted therefrom by §52-584 or other sections." Lambert v. Stovell, 205 Conn. 1, 4, 529 A.2d 710 (1987).[1] *See* Orticelli v. Powers, 197 Conn. 9, 16, 495 A.2d 1023 (1985) (holding section 52-577 is also the operative statute of limitation for 42 U.S.C. §1983 claims.); Lounsbury v. Jeffries, 25 F.3d, 131, 134 (2d Cir. 1994). Thus, section 52-577 is the applicable statute of limitation for any possible federal constitutional claim that may be fairly inferred from Simler's complaint.[2]

---

[1]Conn. Gen. Stat. 52-584 reads:

No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed.

[2] Conn. Gen. Stat. §52-577 reads:

No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of.

The following facts are undisputed:

- Simler had notice of the Plan on or about March 24, 1999. **Defs. L.R. Statement, ¶18.**

- The Board of Education approved the Plan to include 16 most senior individuals on June 1, 1999. **Defs. L.R. Statement, ¶29.**

- Simler knew she was not approved to participate in the Plan because she did not meet the Plan requirements on June 2, 1999. **Defs. L.R. Statement, ¶36.**

- Simler commenced this action on September 4, 2002, more than three (3) years after being denied participation in the Plan. **Defs. L.R. Statement, ¶2.**

Based on these undisputed facts, any claim by Simler concerning participation in the Plan or being excluded there from, is barred by the applicable statute of limitations set forth in Conn. Gen. Stat. §52-577. Orticelli v. Powers, 197 Conn. 9, 16, 495 A.2d 1023 (1985); Lounsbury v. Jeffries, 25 F.3d, 131, 134 (2d Cir. 1994).

Accordingly, summary judgment should enter in favor of all defendants as to any claim by Simler that exclusion from the Ohio Plan violated her federal constitutional rights whether based on due process or equal protection.

### C.   BASED UPON THE UNDISPUTED MATERIAL FACTS, PLAINTIFF'S DUE PROCESS CLAIM FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED AS A MATTER OF LAW.

Simler has two related claims concerning the violation of her due process rights. First, Simler claims that the defendants intentionally excluded her from participation in the Ohio Plan. Second, Simler claims that the defendants also violated her due process rights when they requested that the State of Connecticut Commissioner of the Department of Education revoke her teaching certificate. As a matter of law, the plaintiff fails to state a claim upon which relief may be granted that either Struzinsky or the Board of Education violated her Fourteenth Amendment Due Process rights.

### 1.     **Procedural Due Process.**

In order to state a claim for deprivation of procedural due process in violation of section 1983, a plaintiff must allege that the government deprived him of a legitimate property right without due process of law. *See* Greene v. Town of Blooming Grove, 935 F.2d 507, 510 (2d Cir. 1991); Fusco v. Connecticut, 815 F.2d 201, 205 (2d Cir. 1987). This property right must be substantial enough to justify the protection of federal law. *See* A. Aiudi & Sons v. Town of Plainville, 862 F. Supp. 737, 741 (D.Conn. 1994) (holding that a mere breach of contract does not constitute a constitutional deprivation). The range of property interests protected by the Due Process Clause is not boundless. Id. (stating, "it is clear that the circumstances in which a contract will give rise to a constitutionally protected interest are drastically limited"). As the Supreme Court stated in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972),

> [t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

Id. at 577, 92 S.Ct. 2701.

Upon examination, it is clear that Simler did not have a "unilateral expectation" to participate in the Plan.

### i.     *Simler Lacks A Property Interest In The Plan.*

Generally, employees have a property right in their pension. Winston v. City of New York, 759 F.2d 242 (1985) (New York public school teachers have a property interest in their contractual right to a pension upon fulfilling statutory conditions); *see also* Pineman v. Oechslin, 195 Conn. 405, 416-7 (1985) ("we note that the employees have statutory rights to retirement benefits once they satisfy the eligibility requirement of the act by becoming eligible to receive benefits. … In addition, we conclude that the statutory pension scheme establishes a property interest on behalf of all state employees in the existing retirement fund, which interest is entitled to protection from arbitrary legislative action under the due process provisions of our state and federal constitutions.").  While Simler may have a property interest in her pension, she does not have a property interest in the early retirement incentive plan. In order to have an

entitlement, the person must have already received the benefit, or at least had a previously recognized claim to it. The Supreme Court stated in Lyng v. Payne, 476 U.S. 926 (1986), "[w]e have never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim for entitlement" protected by due process. Id. at 942.

Simler cannot establish a property interest in participation in the Plan. Qualification or eligibility is based upon age (attainment of age 50 prior to July 1, 1999) and participation limits imposed by the Branford Board of Education. School boards may limit the number of employees for whom it will purchase service to a specific percentage of the work force based upon service in Branford. Because the Board of Education chose a level of time of service that was greater than the level of service that Simler possessed in **Branford,** she was not eligible. Simler, who had been a teacher for about 27 years at the time the plan was offered, was only a teacher **in Branford** for 10 years. This fact made her ineligible for the plan. Additionally, Simler had already issued her irrevocable resignation on November 12, 1998. Accordingly, Simler did not have a unilateral expectation to participate in the Plan. Process is only due when a property interest exists. Because Simler did not have a property interest in participating in the Plan as discussed above, no process was due.

> ### ii.    Simler Is Not Entitled To Any Process From The Board Of Education Concerning The Request To Revoke.

Simler's claim that the Branford Board of Education owed her due process before they requested the revocation of her teaching certificate is flatly misplaced. It is undisputed that the Branford Board of Education had no independent power to revoke her certificate. That power rested solely with the State of Connecticut Board of Education.[3] Connecticut law gives the superintendent of schools or any interested

---

[3] Section 10-145d-612 (b) of the Regulations of Connecticut State Agencies provides in pertinent part:

> Request for revocation. A request for revocation of a certificate may be made by a board of education, by a superintendent of schools, or by any person with a legitimate interest, hereinafter called "the requesting party." Such request shall be in writing, signed and notarized and shall state in reasonable detail the facts upon which revocation is

person the power to request revocation of a teaching certificate. It is undisputed that the State of Connecticut Commissioner of Education is the only party that can begin the process by filing a complaint. Based on these circumstances, Simler was not entitled to any process from the Branford Board of Education. She got all the process she was due from the administrative process before the State of Connecticut Commissioner of Education. The administrative process before the Commissioner is replete with due process protection. Joyell v. Commissioner of Education, 45 Conn. App. 476, 480-5 (1997).

### 2. Substantive Due Process.

Simler appears to claim that the request to revoke her teaching certificate and the exclusion from the Plan violated her substantive due process under the Fourteenth Amendment. This claim can only succeed if the defendants' actions were arbitrary and capricious. In order to succeed on a claim for violation of substantive due process, the Plaintiff must establish either a protected property or liberty interest in the interest she has lost and that the government actions in question were arbitrary and capricious. Mitchell v. City of Moore, Oklahoma, 218 F.3d 1190, 1198 (10th Cir. 2000).

Even assuming that Plaintiff can establish a property interest in the Plan, she must still establish that the deprivation of that interest by Defendants was arbitrary and capricious. The Supreme Court has emphasized that only that most egregious official conduct will qualify as arbitrary in the constitutional sense. County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998). The substantive component of the Due Process Clause is violated by executive action only when that action can properly be characterized as arbitrary or conscience shocking by constitutional standards. Collins v. Marker Heights, 503 U.S. 115, 128 (1992).

As a matter of law, either taken together or taken separately, the conduct alleged by Simler in this case does not rise to the level of being arbitrary and capricious or

---

requested, which shall include but not be limited to relevant names of persons, dates and places. Any such request shall be filed with the Commissioner.

Conn. Gen. Stat. §10-145b(m) provides in relevant part: "The State Board of Education may revoke any certificate issued pursuant to sections 10-144o to 10-149, inclusive."

"conscience shocking" to the extent that the Plaintiffs substantive due process rights were violated. In this case, the Board of Education conducted an investigation into Simler's conduct following her arrest. Rather than commence termination proceedings, Simler and the Board of Education reached a settlement agreement. Following the conclusion of that agreement, the Board of Education forwarded the results of the investigation to the Commissioner of Education with a request to revoke Simler's teaching certificate. The Board of Education's measured approach was not arbitrary or capricious. The Board of Education, charged with one of society's most important responsibilities – education – took the steps it believed were right and in the best interests of the students, the community and the state. The findings of the State of Connecticut Commissioner of Education demonstrate the correctness of the Board's actions. *See* **Exhibit E.**

Accordingly, summary judgment is appropriate in favor of the defendants on all due process claims.

> **D.    BASED UPON THE UNDISPUTED MATERIAL FACTS, PLAINTIFF'S EQUAL PROTECTION CLAIM FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED AS A MATTER OF LAW.**

Simler's equal protection claims distill to (1) a claim that she was treated differently regarding the early retirement plan and (2) other teachers were arrested but no request was made to revoke their teaching certificates. In evaluating equal protection challenges to social or economic legislation like that at issue here, the appropriate standard of review under the United States Constitution is the rational basis test, unless the legislation involves a suspect class or a fundamental right. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254-55, 87 L.Ed.2d 313 (1985); U.S. R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 174-77, 101 S.Ct. 453, 459-61, 66 L.Ed.2d 368 (1980) It is undisputed that retirees or potential retirees are not a suspect class. Further, Simler has not alleged that the challenged classification offends any recognized fundamental right.

Social and economic legislation, like early retirement plans, is vulnerable to equal protection challenges only when it is wholly arbitrary. Cleburne, 473 U.S. at 440, 105 S.Ct. at 3254-55. The party challenging the regulation at issue has the burden of demonstrating that no conceivable legitimate public interest is furthered by the classification. Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 465, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981)).

### 1.    Equal Protection.

The plaintiff appears to press an equal protection claim pursuant to a "class of one" theory.  The defendant submits that he is entitled to summary judgment as to a "class of one" claim for the following reasons: (i) the plaintiff cannot maintain an equal protection "class of one" claim absent evidence of malice or bad faith; (ii) the plaintiff cannot maintain an equal protection "class of one" claim where he has suffered no differential treatment in the terms of his employment; (iii) other similarly situated employees were not treated differently.

In Village of Willowbrook v. Olech, 528 U.S. 562, 565 (2000), the plaintiff alleged that "the Village intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners."  The plaintiff further alleged that said demand was irrational and wholly arbitrary.  Id.  The Court held that these allegations were sufficient to survive a 12(b)6 motion for failure to state a cognizable claim under the Equal Protection Clause.  Id. at 563, 565.

Prior to Willowbrook, the rule in the Second Circuit was that a selective enforcement claim under the Equal Protection Clause required a showing that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  Giordano v. City of New York, 274 F.3d 740, 750-51 (2nd Cir. 2001); see also, Harlen Associates v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2nd Cir. 2001).  To date, the Second Circuit has expressly declined to address

the issue of whether <u>Willowbrook</u> has changed this Circuit's long-standing requirement that a "class of one" plaintiff show malice or bad faith.  *See* <u>Giordano</u>, 274 F.3d at 751; <u>Harlen</u>, 273 F.3d at 500.  This Circuit has, however, stated that a "class of one" plaintiff must still show "not only 'irrational and wholly arbitrary' acts, but also <u>intentional</u> disparate treatment."  <u>Giordano</u>, 274 F.3d at 751 (internal citations omitted).

   An essential element of a "class of one" claim is that the plaintiff was ***treated differently from all others similarly situated***.   *See* <u>Willowbrook</u>, 528 U.S. at 564; <u>Jackson v. Burke</u>, 256 F.3d 93, 96-97 (2nd Cir. 2001); <u>Giordano</u>, 274 F.3d at 750-51; and <u>Harlen</u>, 273 F.3d at 499. When plaintiffs seek to draw inferences of discrimination by showing that they were "similarly situated in all material respects" to the individuals to whom they compare themselves, <u>Shumway v. United Parcel Serv., Inc.</u>, 118 F.3d 60, 64 (2d Cir. 1997), their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances.  <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 40 (2d Cir. 2000); *see also* <u>McGuinness v. Lincoln Hall</u>, 2001 WL 993572 (2d Cir. 2001).  What is key is that they be similar in significant respects. <u>Id.</u> *Accord*, <u>Lizardo v. Denny's, Inc.</u>, 270 F.3d 94, 101 (2nd Cir. 2001).

### 2.    <u>Simler's Equal Protection Claim Fails.</u>

#### *i.*    *There Is No Evidence Of Malice Or Bad Faith.*

   In this case, there is no evidence that the Board or Struzinsky acted out of vindictiveness or ill will towards the plaintiff.  As such, the plaintiff's claim should fail. Justice Breyer wrote the following in his concurring opinion in <u>Willowbrook</u>:

- 16 -

The Solicitor General and the village of Willowbrook have expressed concern lest we interpret the Equal Protection Clause in this case in a way that would transform many ordinary violations of city or state law into violations of the Constitution.  It might be thought that a rule that looks only to an intentional difference in treatment and a lack of a rational basis for that different treatment would work such a transformation…. This case, however, does not directly raise the question of whether the simple and common instance of a faulty zoning decision would violate the Equal Protection Clause…because the respondent had alleged an extra factor as well - a factor that the Court of Appeals called "vindictive action," "illegitimate animus," or "ill will."… [T]he presence of that added factor in this case is sufficient to minimize any concern about transforming run-of-the-mill zoning cases into cases of constitutional right.

Willowbrook, 528 U.S. at 565-66 (Breyer, J., concurring).

Prior to Willowbrook, the Second Circuit consistently held that malice or bad faith was essential to proving a "class of one" equal protection claim.  *See* Giordano, 274 F.3d at 750-51; Harlen, 273 F.3d at 499; Lisa'a Party City, Inc. v. Town of Henriettta, 185 F.3d 12, 16 (2nd Cir. 1999); LeClair v. Saunders, 627 F.2d 606, 609-10 (2nd Cir. 1980).  That law is unchanged.  As stated above, the Second Circuit has yet to address the issue of whether a plaintiff must prove malice of bad faith in light of *Willowbrook*.  It is important to note, however, that in Willowbrook, the Court was deciding only whether the plaintiff's complaint could survive a 12(b)6 motion.  Moreover, Justice Breyer noted that personal animus was alleged in Willowbrook.  Other circuits have interpreted Willowbrook as not eliminating the personal animus requirement.  *See* Harlen, 273 F.3d at 500, *citing*, Hilton v. City of Wheeling, 209 F.3d 1005, 1008 (7th Cir. 2000), *cert. denied*, 531 U.S. 1080 (2001); Shipp v. McMahon, 234 F.3d 907, 916 (5th Cir. 2000).

The defendant urges this court to do the same.  Simler testified that she had no evidence of the intent of the Board of Education or Chairman Struzinsky. **Def. L.R. Statement, ¶70.** Absent any evidence of malicious intent, the plaintiff's "class of one" claim should fail.

## ii.    No Adverse Employment Action Was Taken

In order to prevail on a selective enforcement "class of one" claim, the plaintiff must establish that some action or deliberate inaction was taken against him.  See e.g.,

Latrieste Restaurant v. Village of Port Chester, 188 F.3d 65 (2nd Cir. 1999) (enforcement of zoning regulation); Lisa's Party City, 185 F.3d at 13 (denial of plaintiff's request for a variance); Zahra v. Town of Southold, 48 F.3d 674, 683 (2nd Cir. 1995) (enforcement of Town Code by issuing remedial orders and tickets); FSK Drug Cvorp. v. Perales, 960 F.2d 6, 7 (2nd Cir. 1992) (denial of re-enrollment application without prior hearing); LeClair, 627 F.2d at 608 (suspension of plaintiff's farm).

The defendants submit in the absence of an arbitrary adverse employment action, a cognizable equal protection claim does not arise. In order to prevail on a disparate treatment claim under Section 1983, a plaintiff is required to show intent, as well as an adverse employment action. *See* Sorlucco v. New York City Police Dept., 888 F.2d 2 (2nd Cir. 1989); Weeks v. New York State, 273 F.3d 76, 85 (2nd Cir. 2001); McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). A lesser obligation certainly is not warranted for a "class of one" plaintiff that does not rely on his status as a member of a protected class.

"An adverse employment action is a 'materially adverse change in the terms and conditions of employment.'" Weeks, 273 F.3d at 85. "[E]mployment actions are not adverse where pay, benefits, and level of responsibility remain the same." Martin v. Kroger Co., 65 F. Supp.2d 516, 557 (S.D. Tex. 1999), *quoting*, Watts, 170 F.3d at 511.

In this case, neither the Board of Education nor Struzinsky took any adverse employment action. To the extent that the issues concerning participation in the early retirement plan are not barred by the applicable statute of limitations, Simler was not eligible for participation in the plan. Simler was on unpaid leave, was not teaching and had already concluded a settlement agreement that stated:

> Teacher acknowledges and agrees that she is voluntarily resigning her employment with the Board in accordance with this Agreement. The teacher agrees that other than the provisions set forth in this Agreement, no further monies, salary or compensation whatsoever will be paid to the teacher or are owed to the teacher by the Board, including its present or former agents, employees, attorneys, commissioners, elected or appointed officials.

Simler was not entitled to receive anything from the Board of Education that was not expressly listed in the settlement agreement.

At the time the request was made to revoke Simler's teaching certificate, Simler was no longer employed by the Board of Education. Her resignation was effective more than two (2) months prior to the date of the request. More importantly, the actual revocation action was taken by the State of Connecticut Commissioner of Education, the authority for Simler's certificate. Neither the Board of Education nor Struzinsky had any power to actually revoke Simler's certificate. Absent evidence of an adverse employment action, the plaintiff's action must fail - because the plaintiff has not been deprived of any constitutional right.

### iii.    Simler is not a Class of One

An essential element of a "class of one" claim is that the plaintiff was **treated differently from all others similarly situated**.   *See* <u>Willowbrook</u>, 528 U.S. at 564; <u>Jackson v. Burke</u>, 256 F.3d 93, 96-97 (2nd Cir. 2001); <u>Giordano</u>, 274 F.3d at 750-51; and <u>Harlen</u>, 273 F.3d at 499. When plaintiffs seek to draw inferences of discrimination by showing that they were "similarly situated in all material respects" to the individuals to whom they compare themselves, <u>Shumway v. United Parcel Serv., Inc.</u>, 118 F.3d 60, 64 (2d Cir. 1997), their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances.  <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 40 (2d Cir. 2000); *see also* <u>McGuinness v. Lincoln Hall</u>, 2001 WL 993572 (2d Cir. 2001).  What is key is that they be similar in significant respects. <u>Id.</u> *Accord*, <u>Lizardo v. Denny's, Inc.</u>, 270 F.3d 94, 101 (2nd Cir. 2001).

In response to discovery requests, Simler has pointed to Jerry Friedman and Harold Von Hofe. Friedman and Von Hofe are teachers who had involvement with the state criminal justice system while employed by the Board of Education. Neither teachers' situation is sufficiently similar to the facts and circumstances of Donna Simler to be appropriate for the equal protection analysis.

Jerry Friedman was accused of assaulting a student on October 20, 2000 during school hours on school property. Friedman was placed on paid administrative leave

while the matter was investigated by his principal and by Dr. Storm. Dr. Storm conducted an investigation of the incident and determined that questions of fact existed whether Friedman's conduct was not an assault but that Friedman acted in self-defense. Dr. Storm's investigation determined that Friedman's conduct did not warrant the initiation of termination proceedings. In light of all the evidence, Dr. Storm suspended Friedman without pay for three (3) days.

Friedman's situation is nothing like Simler's situation. With regard to Friedman, Dr. Storm took the disciplinary steps that he believed were warranted based on the evidence. The fact that Friedman's conduct may have been a result of self-defense did not implicate his fitness as a teacher that might warrant a request to revoke Friedman's teaching certificate. Branford Board of Education's independent investigation determined that Simler viciously assaulted her ex-boyfriend with a hammer, inflicted serious injuries and fled from apprehension. **Exhibit B, Att. 1.** Friedman's conduct did not rise to the level of Simler's. In fact, circumstance existed that suggested Friedman's actions may have been the result of self-defense. Friedman's situation is nothing like Simler's.

Harold Von Hofe was arrested on December 4, 2001, along with members of his family, for allegedly operating a marijuana factory from his home. Upon learning of his arrest, Dr. Storm suspended Von Hofe with pay pending an internal investigation. The Board of Education hired the same counsel who investigated Simler to investigate the allegations against Von Hofe. During the investigation into Von Hofe, his teaching certification expired. The investigation was not completed into Von Hofe's conduct because the expiration of his teaching certificate was sufficient for automatic termination. Due to the expiration of his teaching certificate, Dr. Storm terminated Mr. Von Hofe on April 29, 2002.

Von Hofe's situation is nothing like Simler's situation. With regard to Von Hofe, Dr. Storm suspended Von Hofe and initiated an immediate investigation. Von Hofe's teaching certification lapsed during the investigation and that was sufficient to terminate him from employment. No request to revoke his teaching certificate was made because

the Branford Board of Education did not complete its independent investigation. Therefore, the Branford Board of Education lacked independent verification of the facts and circumstance that gave rise to the criminal allegations and the arrest of Von Hofe to warrant seeking the issuance of a request to revoke Von Hofe's teaching certification.

Accordingly, neither Friedman nor Von Hofe are sufficiently similar to Simler for equal protection purposes. Simler cannot establish that she was treated differently from similarly situated people. Therefore, summary judgment is appropriate in favor of the defendants on the equal protection claims.

> **E.  EVEN IF THE COURT CONCLUDES THAT THE PLAINTIFF'S COMPLAINT ADEQUATELY STATES PROCEDURAL OR SUBSTANTIVE DUE PROCESS AND/OR EQUAL PROTECTION CLAIMS, THE CLAIMS AGAINST STRUZINSKY ARE BARRED BY THE DOCTRINE OF LEGISLATIVE IMMUNITY.**

Edward Struzinsky as a member of the Branford Board of Education has absolute immunity for legislative functions. Bogan v Scott-Harris, 523 U.S. 44, 48 (1998).  Whether an act is legislative turns on the nature of the act rather than the motive or intent of the official.  Id. at 54. When a governing body votes, as a part of its budget or policy-making process, to eliminate positions (or by extension, to seek revocation or approve retirement plans), its members may be protected by absolute legislative immunity. See Orange v. City of Suffolk, 830 F. Supp. 701, 705 (E.D.N.Y. 1993); Rini v. Zwirn, 886 F. Supp. 270 (E.D.N.Y. 1995) (board members who voted to eliminate funding for a whole class of positions entitled to legislative immunity).

Struzinsky was carrying out a discretionary, policymaking decision of the Branford Board of Education to seek the revocation of Simler's teaching certificates and, as such, should be protected by legislative immunity. Approval of a retirement plan is equally a legislative act. Therefore, summary judgment is appropriate in favor of the Struzinsky on the due process and equal protection claims.

**F.    EVEN IF THE COURT CONCLUDES THAT THE PLAINTIFF'S COMPLAINT ADEQUATELY STATES PROCEDURAL OR SUBSTANTIVE DUE PROCESS AND/OR EQUAL PROTECTION CLAIMS, THE CLAIMS AGAINST STRUZINSKY ARE BARRED BY THE DOCTRINE OF QUALIFIED IMMUNITY.**

In response to the plaintiff's complaint, Struzinsky has asserted his actions are protected by the doctrine of qualified immunity.

**1.    Doctrine of Qualified Immunity.**

The defense of qualified immunity shields government agents "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." McEvoy v. Spencer, 124 F.3d 92, 97 (2d Cir. 1997), *quoting* Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is more than just a defense; ***the doctrine of qualified immunity is an immunity from suit***. Locurto v. Safir, 264 F.3d at 163. (emphasis added.)

A right is "clearly established" when "[t]he contours of the right [are] . . . sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . [T]he unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). *See, e.g.* Malley v. Briggs, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly break the law"); Mitchell v. Forsyth, 472 U.S. 511, 528 (1985) (officials are immune unless "the law clearly proscribed the actions they took").

In determining whether a particular right was clearly established at the time defendants acted, this Circuit has considered three factors: (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant or official would have understood that his or her acts were unlawful. Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir. 1991). *See* Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989), *citing* Anderson, 483 U.S. at 640.

Recently, the Supreme Court has re-emphasized the need to look carefully at the "contours" of the right allegedly violated by a public official when undertaking the qualified immunity analysis. Saucier v. Katz, 533 U.S. 194 (2001). With regard to this litigation, for instance, there is no doubt that the case of Graham v. Connor, 490 U.S. 386 (1989), clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet, the Supreme Court has concluded that observation of that general principle is simply not enough when undertaking a qualified immunity analysis.

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court reiterated the need for a careful examination of the particular constitutional right alleged to have been violated when considering the defense of qualified immunity. Not only should the right itself be identified with a higher degree of specificity, the precise contours of ***the application of that more specific right to the facts at hand must be made by the district court reviewing a defense of qualified immunity***. Saucier v. Katz, 533 U.S. 194 (2001) (emphasis added). The Saucier v. Katz Court reiterated the admonition from Anderson v. Creighton that:

> [t]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

Saucier v. Katz, 533 U.S. at 202.

Since the decision in Saucier v. Katz, the Supreme Court decided Hope v. Pelzer, 536 U.S. 730 (2002), providing additional guidance to litigants and courts examining the issues within and part of the defense of qualified immunity. In Hope v. Pelzer, 536 U.S. 730 (2002), the Supreme Court denied qualified immunity to three correctional officers who had handcuffed a prisoner to a "hitching post" as punishment for non-compliance with various orders and rules. The Supreme Court's decision reversed the Court of Appeals for the Eleventh Circuit which had affirmed the district court's grant of summary judgment based on qualified immunity to the three correction officers in question.

The Supreme Court in *Hope* rejected the Eleventh Circuit's rule that the test for the existence of a clearly established right that would allow a public official to understand the potential wrongfulness of his conduct should be evaluated in light of federal law that was "pre-existing, obvious and mandatory." *See* Hope, 536 U.S. at 734. While the Eleventh Circuit had agreed that the conduct itself was violative of the Eighth Amendment, the panel held the corrections officers were not on notice that such conduct was unlawful. The Eleventh Circuit held that prior cases should be "materially similar." Finding none, the Eleventh Circuit affirmed the district court's decision granting qualified immunity to the corrections officers.

In reversing the Court of Appeals for the Eleventh Circuit, the Supreme Court rejected the gloss placed on the Saucier v. Katz analysis for qualified immunity by that Circuit that there must be reported cases that are "materially similar" before a violation is found. In so holding, the Supreme Court adopted the "fair warning" standard found in United States v. Lanier,  520 U.S. 259 (1997) as an additional methodology to evaluate the second prong of the qualified immunity analysis.

In Lanier, the Supreme Court began its analysis with the understanding that in the situation of qualified immunity, "it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The Court reasoned that officers sued in a civil action for damages under 42 U.S.C. § 1983 should have the same right to fair notice as do defendants charged with the criminal offense defined in 18 U.S.C. § 242. In reviewing Section 242, the Court observed that it makes it a crime for a state official to act "willfully" and under color of law to deprive a person of rights protected by the Constitution. The Lanier Court held that the defendant was entitled to "fair warning" that his conduct deprived his victim of a constitutional right, and that the standard for determining the adequacy of that warning was the same as the standard for determining whether a constitutional right was "clearly established" in civil litigation under Section 1983.

In <u>Lanier</u>, the Eleventh Circuit had assumed (and held) that a criminal defendant should be held to a "substantially" higher standard of notice for the purposes of Section 242. In <u>Lanier</u>, the Supreme Court rejected this approach, and reasoned:

> This is not to say, of course, that the single warning standard points to a single level of specificity sufficient in every instance. In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.

<u>Hope</u>, 536 U.S. at 739-40 (internal citations omitted).

In sum, the Supreme Court in <u>Hope</u> rejected the "materially similar" gloss placed on a qualified immunity analysis as well as the notion that the absence of a reported case on point equates to a holding that qualified immunity applied in a given situation. In so holding, the Supreme Court emphasized the need for the detailed, searching and thorough analysis each and every time the defense based on the doctrine of qualified immunity is raised. The decision in <u>Hope v. Pelzer</u> is, in one sense, a continuation of the Supreme Court's admonition that the most important part of any qualified immunity decision is the examination of the constitutional right at issue and "the precise contours of the application of that more specific right to the facts at hand must be made." <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001). In rejecting the "materially similar" standard espoused by the Eleventh Circuit, the Court has done nothing more than demand a high standard – not in pleading or proof – but in the continued, searching, and thorough, step-by-step examination of the defense of qualified immunity in the manner long-established by clear and unequivocal precedent.

In <u>Hope</u>, the Court held that the corrections officers were on notice that their conduct was clearly unlawful. Not long after the decision in <u>Hope</u>, the Second Circuit stated:

> Our analysis of a qualified immunity claim consists of a three step inquiry. *See* Wilson v. Layne, 526 U.S. 603, 609 (1999); X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 65-66 (2d Cir. 1999). First, we must determine whether plaintiff has alleged a violation of a constitutional right. Then we consider if the violated right was clearly established at the time of the conduct. *See* Saucier v. Katz, 533 U.S. 194, 201 (2001). Finally, if plaintiff had a clearly established, constitutionally protected right that was violated by the actions of the [defendants], he or she must demonstrate that defendants' actions were not objectively reasonable. X-Men, 196 F.3d at 66. This three step inquiry should typically be done in sequential order. Cty. of Sacramento v. Lewis, 523 U.S. 833, 842, n. 5 (1998).

Harhay v. Town of Ellington, et al., 323 F.3d 206, 211 (2d Cir. 2003).

This statement of the law succinctly captures just the sort of step-by-step, orderly methodology mandated by twenty years of Supreme Court precedent. Furthermore, this Court recognized that the failure to establish any one step of the analysis grants qualified immunity to the defendant in question.

> Defendants may benefit from qualified immunity if plaintiff is unable to establish any of these three steps. *See* X-Men, 196 F.3d at 65-66 ("These three issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third."). Thus, if there is no deprivation of a constitutional right alleged by [the plaintiff] (the first step), there is no need for the court to decide if the right was clearly established at the time the [defendants] acted (the second step). *See* Saucier, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

Harhay v. Town of Ellington, et al., 323 F.3d 206, 211-2 (2d Cir. 2003).

Therefore, before applying the qualified immunity standard, the Court must ask whether there was a constitutional violation in the first instance. *See* Stuto v. Fleishman, 164 F.3d 820, 825 (2d Cir. 1999).

2.      **Simler's Claimed Constitutional Rights Are Not Clearly Established.**

The Supreme Court mandates the careful examination of the claimed constitutional rights in question when examining the defense of qualified immunity. Completion of this analysis leads to one conclusion - the rights claimed by Simler are not clearly established as a matter of law. Simler would have this court hold that she was entitled to due process before the Ohio Plan was adopted, that she was entitled to due process before a request for revocation was submitted (despite having full due process before the actual body that had the power to revoke the certificate and deprive her of the property right) and that equal protection prevented municipal organizations from limiting early retirement incentive plans based on the financial considerations of those plans. None of these so-called rights are clearly established. Thus, Simler's claims should be rejected and the court should find Chairman Struzinsky's conduct protected by qualified immunity.

3.      **The Actions Of Struzinsky Was Objectively Reasonable.**

Even if the court were to accept the wild, speculative claims of the plaintiff as clearly established constitutional rights, Chairman Struzinsky's actions were the epitome of objectively reasonableness. Higher education spending is often only accomplished by raising taxes. Budgets are passed for a reason – prevent spending beyond some set amount. Undoubtedly, Chairman Struzinsky's decision to vote to limit the Plan to the 16 most senior participants based on financial considerations is objectively reasonable as a matter of law. Moreover, a casual examination of the internal investigation into Simler (Exhibit B, Att. 1), demonstrates Chairman Struzinsky had ample reason to request that Simler's teaching certificate be revoked. Simler was accused of a brutal assault on an ex-boyfriend with a hammer and she fled from the crime. These events followed a suspicious fire which endangered the same ex-boyfriend that the evidence suggests was started by Simler. If Chairman Struzinsky's request for revocation is not objectively reasonable as a matter of law, no person will ever aspire to public office. Any finding other than objective reasonableness for Struzinsky's conduct is more than tacit approval

that teachers should not be held to higher standards as examples for our impressionable youth. Indeed, the State of Connecticut Board of Education has twice voted to revoke Simler's teaching certificate, further evidences the reasonableness of Chairman Struzinsky's actions.

Accordingly, summary judgment is appropriate in favor of Chairman Struzinsky based on the doctrine of qualified immunity.

### G. THE PLAINTIFF'S COMPLAINT IS BARRED BY THE DEFENDANTS' FIRST AMENDMENT PRIVILEGE TO SPEAK ON A MATTER OF PUBLIC CONCERN.

It is well settled that persons do not relinquish their first amendment rights to comment on matters of public interest by becoming government employees. Rankin v. McPherson, 483 U.S. 378, 383-84 (1987). The education function provided by local government, including the qualifications of the teachers, affects each and every citizen, especially the young. Accordingly, statements made concerning teacher qualifications and competence, including whether someone should have a teaching certificate, are statements that the public has a right to know. Indeed, the compelling public policy concerns for the protection of school age children, especially in the decertification process, are matters of public concern. Kelley v. Bonney, 221 Conn. 549, 571 (1992). The qualifications of those individuals who teach our young are no less important than the importance of proper police conduct. Schnabel v. Tyler, 230 Conn. 735, 756, 646 A.2d 152 (1994).

The statements concerning the competency of the police force, or potential officers is a matter of public concern protected by the First Amendment. Piesco v. City Of New York, Dept Of Personnel, 933 F.2d 1149 (2nd Cir. 1991) (statements concerning the requirements to be a police officer, including the competency required to become a police officer, are matters of public concern given the "tremendous powers vested in police officers . . . . [and the fact that a police officer] represents the most basic unit of government, one which arguably most affects the day-to-day lives of the citizenry"), citing, Connick v. Myers, 461 U.S. 138, 148, (1983); Barkoo v. Melby, 901

F.2d 613, 618-20 (7 Cir. 1990); <u>McEvoy v. Shoemaker</u>, 882 F.2d 463, 466-67 (10 Cir. 1989).

The qualifications, conduct and competency of the teachers who instruct is as important as the competency of the police force, or potential officers who protect and serve. The defendants' request for revocation of Simler's teaching certification is a statement that speaks to the qualifications, conduct and competency of the teachers, generally, and the same to Simler, individually.

Accordingly, summary judgment is appropriate in favor of the Board of Education and Chairman Struzinsky as the request to revoke Simler's teaching certification is protected by the First Amendment.

### H.     ALL OF SIMLER'S CLAIMS AGAINST THE BOARD OF EDUCATION AND STRUZINSKY ARE BARRED BY THE ABSOLUTE PRIVLEGE TO PRESENT EVIDENCE TO A QUASI-JUDICIAL PANEL.

Simler's claims that are not barred by the statute of limitations are limited to the claims concerning the Board of Education's request to revoke her teaching certification. Because the process to revoke teaching certificates is administered by a quasi-judicial panel, the request to revoke and all testimony given or evidence submitted in support of such a request is protected by an absolute privilege. Therefore, summary judgment is appropriate in favor of all defendants.

In <u>Kelley v. Bonney</u>, 221 Conn. 549 (1992), the Connecticut Supreme Court held the certification proceedings before the State of Connecticut Board of Education is a quasi-judicial proceeding and that the initiating petition is part of that proceeding. <u>Id</u>., 565-72. Such initiating petition includes the request for revocation. <u>Id</u>. at 572. The Connecticut Supreme Court held that the request to revoke and all testimony given or evidence submitted in support of such a request is protected by an absolute privilege.

Accordingly, summary judgment is appropriate in favor of the Board of Education and Chairman Struzinsky as the request to revoke Simler's teaching certification is protected by an absolute privilege before a quasi-judicial proceeding.

I.    **ANY CLAIM FOR RETIREMENT BENEFITS IS BARRED BY SIMLER'S EXECUTION OF THE SETTLEMENT AGREEMENT BY WAIVER AND RELEASE AND ACCORD AND SATISFACTION.**

Simler waived any rights to make any claims for the retirement incentive plan based upon her separation agreement.  She specifically agreed that "no further monies, salaries or compensation whatsoever will be paid to the teacher or are owed to the teacher by the Board." Therefore, Simler specifically waived any claims to the benefits and should be estopped from claiming such benefits.

In the context of a simple money debt, "[t]o prove an accord and satisfaction, the defendant must show that at time of the agreement there was a good-faith dispute over the existence of a debt or over an amount owed, and that the debtor and the creditor negotiated a contract of accord to settle the claim." Munroe v. Emhart Corp., 46 Conn. App. 37, 42, 699 A.2d 213, *cert. denied*, 243 Conn. 926, 701 A.2d 658 (1997).

Therefore, to the extent that Simler's claims for retirement benefits under the Plan are not barred by the statute of limitations, waiver and release bars her claims. Accordingly, summary judgment is appropriate in favor of the Board of Education and Chairman Struzinsky.

III.    **<u>CONCLUSION.</u>**

For the reasons set forth above, the defendants, EDWARD STRUZINSKY and BRANFORD BOARD OF EDUCATION pray that their Motion for Summary Judgment is granted.

THE DEFENDANTS,
EDWARD STRUZINSKY and
BRANFORD BOARD OF EDUCATION


<u>/s/ John J. Radshaw, III</u>
John J. Radshaw, III, ct19882
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, CT  06114
(860) 249-1361
(860) 249-7665 (fax)
jradshaw@hl-law.com

## **CERTIFICATION**

I hereby certify that on January 16, 2004, a copy of foregoing was served by U.S. Mail, postage pre-paid to all *pro se* parties and counsel of record.

Norman A. Pattis, Esquire
WILLIAMS & PATTIS, LLC
51 Elm Street, Suite 409
New Haven, CT  06510


/s/ John J. Radshaw, III
John J. Radshaw, III