1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

DONNA SIMLER                        CIVIL ACTION NO.

vs.                                 3:02CV01565(JCH)

EDWARD STRUZINSKY,

BRANFORD BOARD OF

EDUCATION                           DECEMBER 11, 2003

DEPOSITION OF DONNA A. SIMLER

APPEARANCES:

        WILLIAMS & PATTIS, LLC
            Attorneys for the Plaintiff
            51 Elm Street
            Suite 409
            New Haven, Connecticut 06510
            203-562-9931
        BY:  TIMOTHY J. MAHONEY, ESQ.

        HOWD & LUDORF
            Attorneys for the Defendants
            65 Wethersfield Avenue
            Hartford, Connecticut 06114-1190
            860-249-1361
        BY:  DAVID S. MONASTERSKY, ESQ.

                GLORIA S. SALA, RPR, LSR #00006
                CERTIFIED SHORTHAND REPORTER

        Niziankewicz & Miller Reporting Service
                972 Tolland Street
                East Hartford, CT 06108
                  (860) 291-9191

# Exhibit C

28

1    Q    That's another way of putting it --

2    A    I just want to make sure I was understanding

3    what you're saying.

4    Q     -- is that correct?

5    A    I believe, yes.

6    Q    So I'm going to refer to Exhibit 8.  On

7    Exhibit 8 you include cost for medical insurance in

8    your damage analysis, and I'm confused why you include

9    that medical insurance in your damage analysis based

10    upon what you just told me about the coverage that you

11    would have received for your medical insurance through

12    your retirement program.

13    A    If I had been working as a teacher during the

14    2000-2001, 2001-2002, 2002-2003 school years, I would

15    not have paid medical insurance, it would have been a

16    benefit given to me.

17    Q    Okay.  So you're saying that's the difference

18    had you been working as a public school teacher?

19    A    Yes.

20    Q    That medical claim?

21    A    This medical claim is what I actually paid

22    during those years, but I would not have had to pay it

23    had it been a benefit given to me as part of my

24    teaching contract.

25    Q    Okay.  You voluntarily resigned from the

29

1    Branford Board of Education; correct?

2        A    Yes.

3        Q    And then in June of 1999 you retired from the

4    Branford Board of Education; correct?

5        A    When you retire as a teacher in Connecticut

6    you must resign from the school system, because the

7    retirement goes through the State.

8        Q    My question was:  You resigned in June of

9    1999, and then after your resignation you retired in

10   June of 1999; am I correct?

11       A    That's not exactly correct.

12       Q    Okay.  You did not submit your retirement

13   papers to the Branford Board of Education in June of

14   1999?

15       A    I believe I did submit them in June of 1999,

16   but those are submitted to the State of Connecticut,

17   not to the school system.

18       Q    So you did not submit a retirement letter to

19   the Branford Board of Education in June of 1999?

20       A    I submitted a letter of resignation in which

21   I informed them that I would be retiring.

22       Q    So what's the difference if you informed them

23   that you're retiring, isn't that submitting a letter

24   of retirement to the Branford Board of Education?

25       A    I believe I submitted a letter of retirement,

30

1    but I didn't submit my retirement papers because those

2    go to the State of Connecticut.

3         Q    I see what you're saying, the actual forms go

4    to the State, but you did submit a letter of

5    retirement to the Branford Board of Education in June

6    of 1999?

7         A    Yes, I did.

8         Q    So as of June of 1999 you had retired as a

9    public teacher in the State of Connecticut; is that

10   correct?

11        A    Correct.

12        Q    So why would you have been receiving medical

13   coverage as a public school teacher in the years 2000,

14   2001, 2002 and 2003, if you had retired as a public

15   school teacher?

16        A    If the -- could you say that question again?

17        Q    You claim in your damage analysis that in the

18   years 2001-2002 you had to pay for your medical

19   insurance because you retired, but had you been

20   teaching you would not have had to pay for that

21   medical insurance.  And my question to you is:  You

22   retired as a public school teacher in June of 1999, so

23   how would you have been employed as a public school

24   teacher thereafter receiving medical coverage through

25   your teaching as a public school teacher if you were

31

1    retired?

2         A    It's my understanding that retired teachers,

3    and I have submitted some documents to show this,

4    retired teachers can go back and teach in public

5    schools, in private schools, teachers who hold certain

6    certifications can go back into the public education

7    system and serve as administrators, language arts

8    consultants.

9         Q    Let me ask you this:  Your claim that you

10   would have been covered for health insurance through

11   teaching or administrator for a public school

12   following June 1999, are these numbers based upon the

13   benefits you received in the Branford Public School

14   System?

15        A    Those numbers are based on the payments I

16   made to the Branford Public School System as my

17   inclusion in the benefits that they offered.

18        Q    Okay.  And when you retired in June of 1999,

19   what was it your intention that you would do for

20   employment after such time?

21        A    In June of 1999 I had decided that for awhile

22   I would work in the private sector so that I could

23   earn my Social Security credits.  As a school teacher

24   we don't get Social Security, and the only way to be

25   able to be eligible later on in life for Social

32

1    Security was to earn my Social Security credits.

2        Q    Do you know how long you would have had to

3    work before earning your Social Security credits?

4        A    I've been told that there's something called

5    40 quarters, although I'm not quite sure how that is

6    calculated.

7        Q    Okay.  Have you ever been told that

8    essentially you have to work the equivalent of ten

9    years in the private sector before you can qualify for

10   Social Security?

11       A    I don't recall being told that.

12       Q    Your understanding there's something called

13   40 quarters?

14       A    That is what I was told.

15       Q    And do you know what the 40 quarters minimum

16   in years in terms of working in the private sector?

17       A    I don't.

18       Q    Forty quarters sounds like ten years; doesn't

19   it?

20       A    I don't know.

21       Q    So when you made the determination you wanted

22   to go and qualify for Social Security and take a job

23   in a private sector, and to this day you work in the

24   private sector, you don't know how long you have to

25   work before you qualify for Social Security benefits?

1        A    I don't, because I believe what I -- the

2    information I was given was that I would get credit

3    for other times I worked in the private sector also,

4    so I don't know that off the top of my head.

5        Q    And when did you work in the private sector

6    before 1999?

7        A    For instance, I had a job during high school

8    and I had a job during college, and there are other

9    times when I wasn't taking my master's degree that I

10   worked part time for a temporary agency, that sort of

11   thing.

12       Q    Did you ever bother to contact the Social

13   Security Administration in 1999 or since that time to

14   determine how long you have to work in the private

15   sector to determine how long you have to work to

16   qualify for Social Security?

17       A    I did not contact them, no.

18       Q    And as you sit here today, you do not know

19   how long you have to work in the private sector to

20   know how long you have to work to qualify for Social

21   Security if you have not already qualified?

22       A    I believe I receive periodic things in the

23   mail from Social Security, they contact me, and I'm

24   not sure if I've already qualified or if I'm close to

25   it.

                 Niziankewicz & Miller Reporting Service
                            972 Tolland Street
                          East Hartford, CT 06108
                             (860) 291-9191

1     Q     But it's your intention when you retired in

2     June of 1999 to work in the private sector until you

3     at least qualified for Social Security benefits?

4     A     Until I at least did, yes.  Well, let me

5     rephrase that.  It was my intention to at that time to

6     work in the private sector so that I could earn more

7     quarters, more, I don't know if quarters is correct, I

8     could earn more toward my Social Security.  I didn't

9     know how long I was going to do that, but I wanted to

10    earn more toward my Social Security at that time.

11    Q     And June of 1999, did you already qualify to

12    receive Social Security benefits if you did not work

13    in the private sector at all after that time?

14    A     It's my understanding I didn't qualify at

15    that time.

16    Q     You had to put some time in the private

17    sector to qualify, your understanding at that time?

18    A     That's my understanding, I did have to.

19    Q     And at this point you don't know if you've

20    qualified for Social Security benefits?

21    A     I'm not positive if I have.

22    Q     Do you believe you have?

23    A     I know I've received something, and I would

24    have brought it with me had I known you were going to

25    ask me this, but I'm not positive if I have or

35

1  haven't.

2      Q    Now, do you know if new hires in other public

3  school systems have to contribute any of the costs of

4  maintaining health insurance other than the Branford

5  Public School System?

6      A    I don't know it for a fact, but I have heard

7  that there are some school systems that do ask for

8  that.

9      Q    Okay.  So it's possible even if you went to

10  work for another school system following your

11  retirement that you would have had to pay at least

12  some of the costs of your medical insurance?

13      A    I believe it is possible.

14      Q    And, in fact, when you resigned from the

15  Branford Board of Education, you could not return to

16  work for the Branford Board of Education; correct?

17      A    It was my understanding that if I was

18  exonerated from the charge against me that I could

19  possibly have returned, however, I didn't know that.

20  I didn't have that in writing or have it as a factual

21  piece of information.

22      Q    Let me ask you to look at Exhibit 3 and ask

23  if you've ever seen that document before?

24      A    Yes, I have.

25      Q    In fact, that's the separation agreement that

36

1   you entered into with the Branford Board of Education

2   I believe it's dated sometime in November of 1998; is

3   that correct?

4        A    I believe it is dated that, yes.

5        Q    And as part of this settlement agreement, as

6   part of this contract you agreed that you shall not

7   seek reemployment with the Branford Board of

8   Education; is that correct?

9        A    It does say that in the agreement, yes.

10       Q    And in this agreement you were required to

11  irrevocably resign your teaching from the Branford

12  Public School System effective June 30th, 1999; is

13  that correct?

14       A    That was part of the agreement, yes.

15       Q    And, in fact, you did do so; is that correct?

16       A    Yes, I did.

17       Q    And their revocable resignation is marked as

18  Exhibit 4; is that correct?

19       A    Yes, it is.

20       Q    So following June 30th, 1999, you were no

21  longer employed by the Branford Board of Education;

22  correct?

23       A    Correct.

24       Q    And the Branford Board of Education was under

25  no obligation to employ you after June 30th, 1999; is

37

1    that correct?

2        A    I believe that's correct.

3        Q    And pursuant to the contract you executed,

4    you agreed not to seek reemployment with the Branford

5    Board of Education; is that correct?

6        A    I believe that's correct.

7        Q    Now there came a time in May of 1998 that you

8    were first paid administrative leave by the Branford

9    Public Schools; is that correct?

10       A    Yes, that's correct.

11       Q    And that came following your arrest that took

12   place in May of 1998?

13       A    That's correct.

14       Q    And what were you specifically charged for

15   when you were arrested in May of 1998?

16       A    I'm not sure I understand your question.

17       Q    You were arrested in May of 1998 and charged

18   with a crime; correct?

19       A    Yes.

20       Q    What crime were you charged with?

21       A    Second degree assault.

22       Q    And do you know what the term "second degree

23   assault" consists of?

24       A    I don't know all the exact legal words to it.

25       Q    Okay.  And, in fact, when you were placed on

Niziankewicz & Miller Reporting Service
972 Tolland Street
East Hartford, CT 06108
(860) 291-9191

38

1    paid administrative leave in May of 1998, you were

2    informed that the Branford Public Schools would

3    conduct an investigation into the circumstances

4    leading up to your arrest; is that correct?

5         A    I believe I was informed, yes.

6         Q    In fact, I have marked as Exhibit 9 a copy of

7    the letter from Dr. Storm to you indicating that you

8    were placed on paid administrative leave, and that

9    they would conduct an investigation into the

10   circumstances surrounding your arrest; is that

11   correct?

12        A    What was the question?

13        Q    I said this document is a copy of the letter

14   that was sent to you from the Branford Public Schools

15   placing you on paid administrative leave and informing

16   you that they were going to investigate the events

17   surrounding your arrest?

18        A    I don't understand.  Did you have a question?

19        Q    I said that a copy of the document -- let me

20   ask you this:  Did you receive this letter?

21        A    Yes, I did.

22             MR. MONASTERSKY:  Why don't we mark this

23             Exhibit 9?

24             (Defendants' Exhibit 9:  Marked for

25             identification.)

1   BY MR. MONASTERSKY:

2        Q    And then at some point following May of 1998

3   you were informed by the Branford Public School System

4   that they intended to pursue termination under the

5   Teacher Tenure Act; is that correct?

6        A    I'm not sure that I received anything about a

7   Teacher Tenure Act.  I did receive notification there

8   was a consideration for termination.

9        Q    Were you not specifically informed by

10  Dr. Storm that he intended to proceed with

11  termination proceedings against you?

12       A    I believe the notification I got there was

13  going to be consideration for termination.

14       Q    And following that you worked out a

15  separation agreement with the Branford Board of

16  Education that is memorialized in the settlement

17  agreement Exhibit 3; is that correct?

18       A    I believe that's what -- I believe that's

19  correct.

20       Q    And during the process that you were in

21  negotiating your separation from the Branford Board of

22  Education you were represented by counsel; correct?

23       A    Yes.

24       Q    And you also had union representation;

25  correct?

40

1        A    Yes.

2        Q    Okay.  Who was your counsel that represented

3    you during that period of time when you were

4    negotiating your separation agreement?

5        A    It was CEA Attorney William Dolan.

6        Q    Okay.  What connection to your separation

7    agreement did the firm of Lynch, Traub, Keefe &

8    Errante have?

9        A    I believe that they once represented the

10    Branford Board of Education on some issue.

11        Q    You believe they represented the Branford

12    Board of Education in the past?

13        A    I believe that was correct.

14        Q    Nothing to do concerning your separation from

15    employment with the Branford Board of Education?

16        A    They never represented me concerning my

17    employment.

18        Q    The reason I'm asking it was determined in

19    your agreement that notwithstanding the foregoing

20    provision the teacher does not release from liability

21    to her the law firm of Lynch, Traub, Keefe & Errante

22    or any of its employees.  I'm just trying to figure

23    out what Lynch, Traub, Keefe & Errante had to do with

24    your employment with the Branford Board of Education.

25    Have you brought any claims against Lynch, Traub,

41

1    Keefe & Errante?

2        A    To the best of my recollection, no.

3        Q    Now, in March of 1999 you, along with all the

4    other teachers and administrators in the Branford

5    Board of Education were informed that the Branford

6    Board of Education approved the implementation of an

7    early retirement incentive plan; is that correct?

8        A    That's correct.

9        Q    In fact, Exhibit 5 is a copy of a memo that

10    you received informing you of the adoption of that

11    early retirement incentive program?

12        A    That is correct.

13        Q    Okay.  And at the time you received this

14    notice you were advised that the Board may limit the

15    number of employees it would purchase the additional

16    service under the plan for?

17        A    Specifically the sentence that --

18        Q    I'm not asking what the sentence specifically

19    says, I just want you to answer my question.  If you

20    need to you can have the question read back.

21        A    Would you read the question back?

22        Q    Would you read the question back, please?

23            (The referred-to question was read by

24            he Court  Reporter.)

25        A    The notification I received was more specific

42

1    than that.

2    BY MR. MONASTERSKY:

3         Q    Okay.  The notification that you received, is

4    it a copy of it in Exhibit 2?

5         A    Yes, there is a copy in Exhibit 2.

6         Q    Okay.  Are you referring to what's been

7    marked as Exhibit 5?

8         A    Yes, I am.

9         Q    Okay.  My question to you simply was that

10   when you received this notice, which has been marked

11   as Exhibit 5, you were informed by that notice that

12   the school board may limit the number of participants

13   in the program; is that correct?

14        A    It was more specific than that.

15        Q    It was more specific, but you were told and

16   you were informed in this notice that the Board could

17   limit the number of those participating in the

18   program; correct?  I'm not asking for the specific

19   language, I'm asking that you were specifically

20   informed that they may limit the number involved in

21   that program?

22        A    Yes, with more specifics.

23        Q    Okay.  And what more specifics were those?

24        A    "School boards may limit the number of

25   employees for whom it will purchase service to a

Niziankewicz & Miller Reporting Service
972 Tolland Street
East Hartford, CT 06108
(860) 291-9191

43

1    specific percentage of the workforce based upon

2    service in Branford" -- was a sentence included in the

3    memo dated March 26, 1999.

4        Q    And that memo was considered informing you

5    that they could limit the number of participants in

6    the program if they so chose?

7        A    According to the State, the regulations that

8    applied to that, yes.

9        Q    They could limit the number of employees;

10   correct?

11       A    As long as they do it by the law.

12       Q    Okay.  And there's nothing in what's been

13   marked as Exhibit 5 that indicates that the Branford

14   Board of Education would include all those applying

15   for the early retirement incentive program would be

16   given that benefit?

17       A    I'm sorry, I can't understand your question.

18       Q    Okay.  There's nothing in that document,

19   Exhibit 5, indicating that the Branford Board of

20   Education intended to include all those who applied

21   for the early retirement incentive program would be

22   given such an early retirement?

23       A    I didn't hear a question in it.

24       Q    Okay.  I said there's nothing in this

25   document --

44

```
 1      A    You're making a statement.

 2      Q    No, it's a question.

 3      A    I don't hear a question.

 4      Q    It's a question.

 5      A    Could you phrase it as a question?

 6      Q    I am phrasing it as a question.

 7           MR. MONASTERSKY:  There are intonations

 8           that phrase a question -- if you're going to

 9           continue to be obstructionist I'm going to

10           move for sanctions.  You know that's a

11           question, and would you instruct your

12           client to answer the question?

13           MR. MAHONEY:  Why don't we take a break?

14           MR. MONASTERSKY:  We can take a break

15           and you instruct your client that intonations

16           can mean a question, and she should know

17           that, she's an English teacher.


18           (A recess was taken from 12:05 p.m.

19           until 12:15 p.m.)

20  BY MR. MONASTERSKY:

21      Q    Ms. Simler, there's nothing in Exhibit 5 that

22  has anything that every applicant who applied for the

23  early incentive plan is to be included in the plan; is

24  that correct?

25      A    I do not see anything in that document.
```

45

1       Q    Can I have an answer to my question, please?

2       A    I said I didn't --

3            MR. MAHONEY:  No.

4            MR. MONASTERSKY:  No, you didn't.  Can I

5       have the question read back, please?  I

6       didn't ask you what you saw in the document.

7       I'm asking you to answer the question.

8            (The last question and answer were read

9       by the Court Reporter.)

10  BY MR. MONASTERSKY:

11      Q    Can I have a yes or no answer to that

12  question?  It's a simple yes or no question.

13           MR. MAHONEY:  You can answer.

14      A    Could I have the question in writing?

15  BY MR. MONASTERSKY:

16      Q    No; you cannot have the question in writing.

17  This is a deposition.

18           MR. MAHONEY:  You can answer that.  If

19       you don't understand the question, that's one

20       thing, or the form of the question, but it's

21       basic information regarding the information

22       in that document.

23      A    To the best of my understanding, no.

24  BY MR. MONASTERSKY:

25      Q    So that statement is correct, that question,

```
 1   the question asks for a correct, yes or no; correct?
 2              MR. MAHONEY:  Now I'm confused.
 3              MR. MONASTERSKY:  Could I have the
 4         question read back one more time, and listen
 5         to the question that's being read to you.
 6         This is a deposition.
 7              (The last question was read by the Court
 8         Reporter.)
 9   A    I'm so sorry, I am listening.
10              MR. MONASTERSKY: You know, Ms. Simler, I
11         read through your transcripts of the trial, I
12         read through your transcripts from the
13         hearings before the State, and my take on it
14         as well as the State's own finding on that
15         hearing report is that you were nothing but
16         obstructionist during those hearings, and if
17         you're going to continue to be obstructionist
18         in this deposition I will bring it to the
19         Court's attention, and this will go much
20         easier if you don't be obstructionist and you
21         cooperate, because all we're trying to get
22         here are the facts and answers to questions,
23         and if you cooperate and don't be
24         obstructionist we'll be out of here a lot
25         sooner.
```

47

```
 1              MR. MAHONEY:  I just want to say for the
 2          record she's trying to be precise.  She
 3          doesn't want to be obstructionist, but she's
 4          trying to be heard and concise.
 5              MR. MONASTERSKY:  Can I have the
 6          question read back, please?
 7              (The referred-to question was read by
 8          the Court Reporter.)
 9    A    Yes.
10  BY MR. MONASTERSKY:
11    Q    Thank you.  And following your receipt of the
12  notice that's marked as Exhibit 5, you applied for the
13  early retirement incentive plan; is that correct?
14    A    Correct.
15    Q    And you were informed that you were not
16  included in those employees that the Branford Board of
17  Education approved for the early retirement plan; is
18  that correct?
19    A    That's correct.
20    Q    And you were informed by a memo that's been
21  marked as Exhibit 6; is that correct?
22    A    That's correct.
23    Q    And you were informed of that by memo dated
24  June 2nd, 1999; is that correct?
25    A    That's correct.
```

48

1      Q    And is it fair to say that either on June

2   2nd, 1999, or beginning immediately, days following

3   June 2nd, 1999, you were advised that the Branford

4   Board of Education would not include you in its early

5   retirement incentive plan for 1999; is that correct?

6      A    That's correct.

7      Q    And when you were informed that you would not

8   be included in the early retirement incentive plan,

9   you contacted the union, specifically, William Dolan;

10  is that correct?

11     A    I believe I did contact Bill Dolan; correct.

12     Q    And do you know if Bill Dolan contacted the

13  Branford Board of Education concerning your failure to

14  be included in the early retirement incentive plan?

15     A    I don't know if Bill contacted them.

16     Q    Do you know if Mr. Dolan contacted the

17  Teacher's Retirement Board concerning your exclusion

18  from the early retirement incentive plan?

19     A    I'm not positive, but I think he did.

20     Q    Now, other teachers and employees that were

21  included in the early retirement incentive plan in

22  1999 for the Branford Board of Education, do you know

23  of any teachers that have less seniority who worked

24  for the Branford Board of Education than you who

25  received the early retirement incentive plan?

49

1    A    It's my understanding that the sixteen

2    teachers who were on the list have more seniority than

3    I did in Branford.

4    Q    And do you know of any facts that would

5    contradict that understanding that you had?

6    A    Not at this time, I don't.

7    Q    Okay.  As far as you know, all the teachers

8    that were included on the early retirement incentive

9    plan had more seniority with the Branford Board of

10   Education than you?

11   A    That was my understanding at the time.

12   Q    And as far as you know today, you don't know

13   differently, let's put it that way?

14   A    I don't know differently that any of them had

15   more seniority in Branford.  I don't know their status

16   overall statewide.

17   Q    And, in fact, the Connecticut statutes

18   require that a board of education must give preference

19   to seniority with its school system, that is, its own

20   employees in determining eligibility for the early

21   retirement incentive plan; is that correct?

22   A    I'm not sure if that's mandated by the State

23   or if that's a system-wide issue.

24   Q    When you say "system-wide", what system are

25   you referring to?

50

1          A     I mean the school system.

2          Q     You're talking about the Branford school

3     system?

4          A     Correct.

5          Q     I'll turn your attention to this part of

6     Exhibit 2 which is your own discovery responses. I'll

7     ask you to review what appears to be a copy of the

8     page Connecticut General Statute 10183 (jj),

9     subsection C, and does that statute not require that

10    teachers with more years of service with a particular

11    school system get preference over teachers with less

12    years of service with that actual school system in

13    determining those eligible for the early retirement

14    incentive plan?

15         A     It appears that's in the statute, yes.

16         Q     And do you know of any teachers or employees

17    of the Branford Board of Education in 1999 that were

18    included in the early retirement incentive plan that

19    had less seniority in the Branford Board of Education

20    than you?

21         A     At this time I don't know of any.

22         Q     Now, on June 9th, 1999, you submitted a

23    letter to Dr. Storm providing him notice of your

24    intention to retire at the end of the 1998-1999 school

25    year; is that correct?

51

1          A     That is correct.

2          Q     And Exhibit 7, there's a copy of that notice

3    that you provided to Dr. Storm indicating that it was

4    your intention to retire; is that correct?

5          A     Yes; this appears to be a copy of it.

6          Q     Do you have an understanding why the Branford

7    Board of Education adopted an early retirement

8    incentive plan in 1999?

9          A     My understanding was that several teachers

10   had approached them about it and asked them if they

11   would consider it.

12         Q     Do you have an understanding why the Branford

13   Board of Education would consider an early retirement

14   incentive plan?

15         A     It was my understanding that they were trying

16   to have some younger teachers come into the school

17   system.

18         Q     They were trying to save money; is that

19   correct?

20         A     That could have been one of the reasons.

21         Q     You included a number of articles from the

22   New Haven Register in your discovery responses, and

23   doesn't one of those articles specifically state that

24   they were hoping to have a cost savings by

25   implementing the early retirement incentive plan?

58

1     Exhibit 10, it's an unsigned document.  Did you sign

2     that copy that is identical to Exhibit 10?

3          A     I'm not sure.

4          Q     Okay.  Are you aware of any other legal fee

5     agreement which covers the scope of the firm of

6     William and Pattis' representation in this matter, in

7     this case?

8          A     I don't believe I am.

9          Q     My question was:  Are you aware of any other

10    legal fee agreement that you entered into with

11    Williams and Pattis concerning your representation in

12    this matter?

13         A     I'm not aware of any.

14         Q     Okay.  Let me ask you this:  Have you paid

15    the firm of Williams and Pattis $15,000 for their

16    representation?

17         A     Yes, I have.

18         Q     In all the proceedings that are currently

19    ongoing, is that correct, total of fifteen for the

20    representation in all those matters; correct?

21         A     That's how I understood it.  I realize this

22    letter specifically says the civil rights action which

23    is the one we're talking about here, but it was my

24    understanding that the $15,000 was to be for

25    everything.

59

1      Q      But the letter also refers to your

2  administrative proceeding and appeal if necessary;

3  correct?

4      A      I'm sorry, yes, it does.

5      Q      And have you paid the firm of Williams and

6  Pattis $15,000?

7      A      Yes, I have.

8      Q      Have you paid them any other further

9  compensation for their representation of you in this

10  matter?

11      A      No; there was a $500 bond or something I had

12  to pay.

13      Q      Okay.  That was a bond that you paid to the

14  Court, that was not to them.

15      A      Okay.

16      Q      Okay.  So you currently work for SBC/SNET

17  part time, but you could work full time if you so

18  chose?

19      A      The hours are available, yes.

20      Q      And it's your choice not to work additional

21  hours?

22      A      Because of my circumstances, yes.

23      Q      You wanted to have the time available to take

24  care of other things?

25      A      The legal -- it's my hours make it easier for

60

1    me to get time off from work to do just like what

2    we're doing today.

3         Q    Now you started receiving retirement benefits

4    shortly after July 1999, and you went to work for

5    SBC/SNET in July 1999, and you had no other employment

6    since that time; correct?

7         A    Not that I can recall.

8         Q    And you have not applied for employment

9    anywhere else that you can recall since 1999?

10        A    Not that I can recall.

11        Q    Since your retirement in July of 1999, have

12   you applied to any other public school system for a

13   job as a teacher or administrator?

14        A    To the best of my recollection, no.

15        Q    Now, in September of 1999 you were informed

16   that a request for a revocation of your teaching

17   certificate had been made; is that correct?

18        A    That is correct.

19        Q    Okay.  And how were you informed of that?

20        A    I received a letter.

21        Q    From whom?

22        A    From the Connecticut State Department of

23   Education.

24        Q    And at some point, did the State Department

25   of Education bring a complaint against you for

61

1    revocation of your teaching certificate?

2        A    I believe they did, yes.

3        Q    And as a result of that complaint, there were

4    a series of hearings held concerning your revocation

5    of your teaching certificate; correct?

6        A    That is correct.

7        Q    In fact, you had at least four hearing dates

8    before the State Board of Education voted to revoke

9    your teaching certificate the first time; correct?

10       A    At least four, yes.

11       Q    And those were conducted by a hearing

12   officer?

13       A    That is correct.

14       Q    And then following the first vote by the

15   State Board of Education who revoked your teaching

16   certificate you requested reconsideration; is that

17   correct?

18       A    That is correct.

19       Q    And the State Board of Education voted to let

20   you proceed with your reconsideration; correct?

21       A    That's correct.

22       Q    And then you went back for a series of

23   additional hearings with the hearing officer; correct?

24       A    That is correct.

25       Q    In fact, there were at least three additional

1    days of hearings; correct?

2        A    I believe there were at least three, yes.

3        Q    And then the State Board of Education voted a

4    second time to revoke all of your educator

5    certificates; is that correct?

6        A    That is correct.

7                MR. MONASTERSKY:  Can I have these

8            documents marked, please?

9                (Defendants' Exhibits 11 through 13:

10           Marked for identification.)

11   BY MR. MONASTERSKY:

12       Q    Ms. Simler, I'm going to ask you to look at

13   what's been marked Exhibit 11, and I'm going to ask

14   you if you've ever seen that document before?

15       A    I believe I have.

16       Q    And, in fact, Exhibit 11 is a copy of the

17   final decision of the Board of Education, and attached

18   to that is a copy of the findings and facts and

19   recommendations of the hearing officer concerning the

20   first round of hearings and vote of the Board of

21   Education to revoke your teaching certificate; is that

22   correct?

23       A    It appears to be, yes.

24       Q    And you then requested reconsideration and

25   the Board voted to send back to the hearing officer

63

1    your case concerning the revocation of your teaching

2    certificate; is that correct?

3        A    That's correct.

4        Q    Show you Exhibit 12, and see if you've ever

5    seen that two-page document before?

6        A    Yes, I believe I have.  I have.

7        Q    Okay.  The first page is the order sending

8    back the proceeding as a result of your petition for

9    reconsideration; is that correct?

10       A    I believe it is, yes.

11       Q    And the second page is your actual petition

12   for reconsideration?

13       A    Yes, it is.

14       Q    And what we've marked as Exhibit 13 is a copy

15   of the final decision of the Board along with the

16   supplemental facts and recommended decision in which

17   the Board the second time voted to revoke your

18   educator certificates?

19       A    I believe it is, yes.

20       Q    And now you are currently appealing the final

21   decision of the Board revoking your teaching

22   certificates; is that correct?

23       A    That's my understanding.

24       Q    And you're appealing from the final decision

25   which has been memorialized in Exhibit 13?

64

1        A    I believe that's the basis of my appeal.

2        Q    Okay.  When was that appeal filed; do you

3    know?

4        A    I believe it was in 2002.  It had been filed

5    earlier than that, but then we were told that we had

6    to wait for the other administrative proceedings to go

7    through first, the reconsideration, so I think it was

8    in 2002.

9        Q    And it's your understanding that that

10    administrative appeal is still pending?

11        A    That's my understanding.

12        Q    And when your administrative matter was sent

13    back after the reconsideration, you were represented

14    by the firm of Williams and Pattis during those

15    hearings; is that correct?

16        A    Yes, that is correct.

17        Q    Do you know if the Commissioner of Education

18    conducted an investigation prior to bringing the

19    administrative complaint against you seeking

20    revocation of your teaching certificate?

21        A    I'm sorry, say that again.

22        Q    Do you know if the Commissioner for the State

23    Department of Education or his office conducted an

24    investigation of you prior to bringing its

25    administrative complaint seeking revocation of your

65

1    teaching certificate?

2        A    It's my understanding that they did.

3        Q    Have you ever seen the documents that were

4    sent by the Branford Board of Education to the

5    Commissioner of Education seeking revocation of your

6    teaching certificate?

7        A    I have seen documents, I'm not sure I've seen

8    all of them, but I have seen documents.

9                MR. MONASTERSKY:  Mark that as an

10               exhibit, please.

11               (Defendants' Exhibit 14:  Marked for

12               identification.)

13               MR. MONASTERSKY:  Back on the record.

14    BY MR. MONASTERSKY:

15        Q    Do you want to clarify one of your previous

16    answers?

17        A    Yes, thank you.  I just realized that the

18    appeal would have been filed after the decision which

19    was in 2003, so that was -- it was first filed in

20    2002, and then it was withdrawn, and then it was filed

21    in 2003.

22        Q    So you had two separate appeals, you filed

23    one and withdrew one, and filed a second one?

24        A    That's right.  That's what I was trying to

25    say before, I just was incorrect about the dates.

66

1      Q    I'll ask you to look at all the documents

2    that have comprised Exhibit I believe that's 14, and

3    then I'll ask you -- keep in mind the question that

4    I'm going to ask you concerning that.

5           Other than those documents, are you aware of

6    any other documents that have been submitted or were

7    submitted to the Commissioner of Education by the

8    Branford Board of Education concerning revocation of

9    your teaching certificate?

10     A    I'm not sure if there are any others, but I

11   am aware of these and I have seen these before.

12     Q    My question is:  Are you aware of any others?

13     A    I don't believe I am.

14     Q    As you sit here today, are you aware of any

15   other documents that were sent from the Branford Board

16   of Education to the State Commissioner of Education

17   concerning revocation of your teaching certificate?

18     A    As I sit here today, I'm not sure.  I don't

19   remember if there were others.  I do remember these.

20     Q    So is it fair to say at this point you do not

21   recall others?

22     A    I don't recall others, yes.

23     Q    Now, included in the packet of documents

24   marked as Exhibit 14 were the documents that were

25   created during the course of the Branford Board of

67

1    Education's investigation into the events surrounding

2    your arrest for assault second; is that correct?

3        A    There are documents in here.  I don't know if

4    it is all of them but, yes, there are documents in

5    here that were part of the investigation.

6        Q    Now I understand you contest the events

7    surrounding your arrest, but for the sake of my

8    questions, it's a hypothetical question, and take as

9    much time as you need to review the investigative

10   documents, assuming that the statements as

11   memorialized in the investigative documents from the

12   police officer as well as the alleged victim were

13   true, assuming they were true, in your opinion would

14   that provide a basis to seek revocation of your

15   teaching certificate?  You can take as much time as

16   you need to review the documents.

17                (Off the record discussion.)

18   BY MR. MONASTERSKY:

19       Q    I'll ask it another way:  Assuming that the

20   version of events as set forth in the Town of Branford

21   investigative documents concerning the circumstances

22   and events surrounding your arrest, assuming those are

23   true, and I know you dispute the truth or you dispute

24   those versions of the events, but assuming the version

25   set forth in those documents is true, would those

68

1    provide a basis to seek revocation of your teaching

2    certificate in your opinion?

3         A    In my opinion, no.

4         Q    Okay.  In your opinion, I'm specifically

5    referring to the memoranda to Mike from Sarah dated

6    June 24th, 1998, which is part of Exhibit 14 as well

7    as the version set forth in the memorandum from Sarah

8    to Mike dated August 14th, 1998, included in Exhibit

9    14 as well as a letter from Michael McKeon to

10   Dr. Bruce Storm, dated August 16th, 1998, which is

11   part of Exhibit 14, assuming that all the events and

12   version of events set forth in those documents is

13   true, you do not believe in your opinion that those

14   would provide a reasonable basis to seek revocation of

15   your teaching certificate?

16        A    I believe they would provide a reasonable

17   basis to seek, yes.

18        Q    And that's all the Branford Board of

19   Education did was seek revocation of your teaching

20   certificate; correct?

21        A    They did seek it, yes.

22        Q    They sent the request off to the State; is

23   that correct?

24        A    That's correct.

25        Q    And the State takes over the investigation

69

1    process from there; is that correct?

2        A    That's my understanding.

3        Q    And then the State takes over the hearing

4    process; correct?

5        A    That's my understanding.

6        Q    And you are provided during that hearing

7    process with the opportunity to present your version

8    and your side of the story; correct?

9        A    Yes.

10       Q    And you went through that hearing process;

11   correct --

12       A    Yes, I did.

13       Q     -- twice; correct?

14       A    Yes.

15       Q    Twice; correct?

16       A    Yes.

17       Q    Now, back in it was I believe the fall of

18   1998 was when you received notification from Dr. Storm

19   that he intended to proceed with termination action

20   against you from the Branford Board of Education;

21   correct?

22       A    Fall of '98, I believe that's correct, yes.

23       Q    And those termination proceedings did not go

24   forward because you worked out a separation agreement

25   with the Branford Board of Education; correct?

79

```
1                    AFTERNOON SESSION

2                    2:10 O'CLOCK P.M.

3

4            D O N N A    A.    S I M L E R,

5    resumed the witness stand, testifying further on her

6    oath as follows:

7

8                    DIRECT EXAMINATION

9    CONTINUED BY MR. MONASTERSKY:

10       Q    Back on the record.  Ms. Simler, are you

11   currently married?

12       A    No.

13       Q    Have you been married in the past?

14       A    Yes.

15       Q    How many times have you been married?

16       A    Once.

17       Q    Okay.  And what were the dates of that

18   marriage?

19       A    August of '72, 1972, through I think it was

20   June of '85.

21       Q    And what was your husband's name?

22       A    James R. Simler.

23       Q    And you have not been married since that time

24   June of '85?

25       A    No.
```

80

1              MR. MONASTERSKY:  Mark this exhibit,

2        please.

3              (Defendants' Exhibit 15:  Marked for

4        identification.)

5    BY MR. MONASTERSKY:

6        Q    Now in your complaint you allege that you

7    were denied your right to substantive and due process

8    and equal protection under the law of the United

9    States Constitution concerning the issues surrounding

10   your early retirement plan.  How were you denied

11   substantive due process?

12       A    I believe it's because I was improperly

13   excluded from the plan, and I was not able to -- I was

14   not informed of when the meeting was going to be to

15   make the decision of those included in the retirement

16   plan.  I didn't receive notice prior to that meeting,

17   and there was no chance for me to respond to it before

18   that meeting.

19       Q    Now, what property right were you denied

20   concerning the early retirement program?

21       A    I believe that it is a -- that my retirement

22   is a property right through the State of Connecticut,

23   and that the years that I was denied on to my

24   retirement were denied me.

25       Q    The additional years in the early retirement

1    plan, you claim that you have a property right to

2    those?

3        A    It's my understanding that those are part of

4    a property right.

5        Q    Okay.  Did you have a property right in the

6    early retirement plan, not talking about your normal

7    retirement benefits, I'm talking about the early

8    retirement program, did you have a property right or

9    not?

10        A    Well, I believe I did, because I was eligible

11    for it and I was improperly denied that.

12        Q    Now, the Branford Board of Education did not

13    have to offer the early retirement program to any

14    employees; correct?

15        A    If they had decided not to offer a plan at

16    all, that's correct, but once they offered it, then

17    anyone who was eligible was eligible.

18        Q    Yes; but the statute doesn't mean just

19    because you're eligible that you had to be included;

20    correct?

21        A    I'm sorry?

22        Q    You said the statute does not require that

23    all those eligible must be included; correct?

24        A    It's my understanding that what the statute

25    says is that if you meet the eligibility, then the

82

1     Board of Education can only exclude by the proper

2     procedure.

3         Q     They can accept limits on how many you want

4     to include; correct?

5         A     According to the way the law is written, they

6     have to follow the procedure, yes.

7         Q     My question is:  Board of Education adopts an

8     early retirement incentive plan, can limit the number

9     of teachers it will include in such plan; correct?

10        A     They can limit it according to the way the

11    law prescribes, yes.

12        Q     Okay.  And you have no evidence that any

13    teachers with less seniority with the Branford Public

14    School System received an early retirement incentive

15    plan in 1999; is that correct?

16        A     I don't have any evidence of that at this

17    time, no.

18        Q     Now, are Board of Education meetings posted

19    anywhere in the public school system?

20        A     I'm not sure.

21        Q     Do you know if there's any publication in any

22    area newspaper as to when Board of Education meetings

23    will be held?

24        A     I don't know for sure, but there might be.

25        Q     Okay.  You haven't even bothered to check

83

1   that out; have you?

2       A    Bothered to check what out?

3       Q    If there is any postings concerning the Board

4   of Education meeting when they adopted the early

5   retirement plan and those that would be included; have

6   you?

7       A    I didn't specifically check that out, no,

8   sir.

9       Q    And you don't know if there are any postings

10  around the school that or any of the schools of the

11  administrative offerings of the public school system

12  informing the public as well as the employees of the

13  Branford Public Schools beyond the Board of Education

14  meeting would be held?

15      A    I don't know for sure.

16      Q    Didn't bother to check that out; have you?

17      A    I did not check that out, no.

18      Q    And that decision was made beginning of June

19  1999 when you were not included in the early

20  retirement incentive plan; correct?

21      A    It's my understanding from minutes of a Board

22  meeting that I received after the fact that it was --

23  there was a meeting held on June 1st of 1999.

24      Q    And you were informed by a memo from

25  Dr. Smotas that you were not included in that memo

84

1    dated June 2nd, 1999; correct?

2        A    That's correct, as I recall.

3        Q    Now, what procedural due process do you claim

4    you were entitled to concerning the early retirement

5    incentive plan?

6        A    (No response).

7        Q    I asked you about substantive, now I'm asking

8    you about procedural due process.

9                MR. MAHONEY:  If you know.

10       A    I'm not sure that I know for sure, but,

11   again, I think that it goes back to not being notified

12   about the date and not being able to be there or have

13   any information in between the decision-making and the

14   vote.

15   BY MR. MONASTERSKY:

16       Q    What do you mean having any information

17   between the decision-making and the vote?  I don't

18   understand that response.

19       A    Well, it's my understanding according to the

20   minutes that it was presented to the Board of

21   Education on June 1st, but the decision had been made

22   already to exclude me if they only presented sixteen

23   names, so there must have been a decision at some

24   point, and then the Board of Education voted on the

25   decision, so I don't know if the Board of Education

1    had another meeting prior to that where they made the

2    decision and then there was the June 1st meeting when

3    they voted on it.  I don't know is what I'm trying to

4    say.

5        Q    Who do you contend made the decision prior to

6    June 1st, 1999, not to include you on those that would

7    be receiving early incentive retirement in the program

8    in 1999?

9        A    Since there was no record or meeting, I don't

10   have any record to tell who was there.

11       Q    Do you even know if it was the Board of

12   Education itself that made that decision or if it was

13   an employee of the Board of Education?

14       A    I don't know.

15       Q    Now, how do you claim that you were denied

16   equal protection under the law concerning the early

17   retirement incentive plan in 1999?

18       A    What are you saying?

19       Q    Equal protection under the law.

20       A    It's my understanding that the law that

21   regulates Ohio Plan programs for the state has very

22   specific guidelines as to how the Ohio Plan can be

23   administered, and I believe that the Branford Board of

24   Education did not file the guidelines in the law the

25   way they were.

86

1     Q   And you claim that not following the

2  guidelines under the law did not give you equal

3  protection under the law?

4     A   I'm not sure I understand that.

5     Q   Exhibit 15 -- have you ever seen Exhibit 15

6  before?

7     A   I have.

8     Q   Okay.  Let me see that.  Can I see it,

9  please?  In fact, this is your complaint that you

10  filed that is the basis of this lawsuit; is that

11  correct?

12     A   It is.

13     Q   Okay.  Paragraph 1 claimed that this is an

14  action for denial of the plaintiff's rights to

15  substantive and procedural due process and equal

16  protection under the law as guaranteed by the 14th

17  Amendment of the United States Constitution, and what

18  I'm asking you is how did the Branford Board of

19  Education and Edward Struzinsky deny you the equal

20  protection of the law as guaranteed by the 14th

21  Amendment of the United States Constitution concerning

22  early retirement incentive plan?

23     A   I don't know how to answer that question at

24  this time.

25     Q   Is there a reason why you don't know how to

87

1    answer it?

2        A    Because I don't have a copy of the 14th

3    Amendment in front of me so that I could review it.

4        Q    Well, that's a claim that you're making in

5    this case.  I would presume you would be prepared to

6    discuss the claim you're making in this case.  You

7    knew this deposition was coming up; didn't you?

8        A    I did know the deposition was coming up.  I

9    didn't know that specific question would be asked of

10   me.

11       Q    Let me ask you this:  How do you claim you

12   were treated differently than --

13       A    As far as the Ohio Plan?

14       Q    Yes, as far as the Ohio Plan.

15       A    The other sixteen teachers who were granted

16   the Ohio Plan, the seventeen teachers who were granted

17   the Ohio Plan two years after that, and the teachers

18   who were granted on the Ohio Plan which was called

19   VERIP, I believe it was, in the '96-'97 school year.

20       Q    Can I see your complaint, please?  Of the

21   sixteen teachers that were granted the inclusion in

22   the early retirement incentive program, which I

23   believe you're referring to as the Ohio Plan, in 1999,

24   as far as you know, they all had more seniority with

25   the Branford Board of Education than yourself; is that

88

1    correct?

2        A    As far as I know, they did.

3        Q    And for the plan which you've indicated is a

4    VERIP Plan in 1997, do you know if there were any

5    teachers or employees of the Branford Board of

6    Education that applied for that program that were not

7    included?

8        A    It's my understanding that everyone who

9    applied was granted.

10       Q    And what's your basis of that understanding?

11       A    I believe I was told that -- off the top of

12    my head, I can't remember.

13       Q    Who told you that?

14       A    Like I said, off the top of my head I can't

15    remember.

16       Q    Do you have any documentation to show that

17    all seventeen that applied were included?

18       A    May I look at Exhibit 2?  Thank you.

19            (Pause.)

20            Okay.  It was my understanding that all the

21    teachers in -- did I say sixteen or seventeen?

22    BY MR. MONASTERSKY:

23       Q    Ninety-seven, I couldn't recall if you said

24    sixteen or seventeen.

25       A    It was my understanding not because someone

Niziankewicz & Miller Reporting Service
972 Tolland Street
East Hartford, CT 06108
(860) 291-9191

89

1   told me verbally, but because I read in the March

2   19th, 1997, minutes of the Branford Board of Education

3   that there was a motion to approve acceptance of the

4   sixteen staff members applying for the early

5   retirement incentive plan, said the motion passed and

6   it was approved in --

7        Q    Is there anything in that motion that says

8   that only sixteen applied?

9        A    It appears from the way it's worded that

10  that's what it means, sixteen staff members applying

11  for early retirement, so it makes it sound like

12  sixteen members applied and they were all approved.

13       Q    Well, for the record, it could mean that they

14  are approving sixteen that applied, but there may be

15  more, but they're only granting sixteen that applied,

16  and then the statute says you take sixteen, you'll

17  assume that's correct?

18       A    It isn't worded that way, so I wouldn't know

19  that it says the sixteen staff members applying for,

20  it sounds like these sixteen staff members applied for

21  and they would be -- that's the way it's worded here.

22       Q    You don't know how many applied in 1997; do

23  you?

24       A    I don't have -- well, I don't know how many

25  applied, but this makes it sound like sixteen staff

90

1   members applied the way it's worded here.

2       Q    You're just going on the wording in the

3   minutes?

4       A    Correct.

5       Q    But you don't know if sixteen applied,

6   twenty-four applied, seventeen applied, you just know

7   that they were approved, acceptance of sixteen staff

8   members applied for the early retirement incentive

9   plan in 1997; correct?

10      A    My understanding is that -- I have never seen

11  the copies of the applications to know how many

12  applied, but that wording makes me think sixteen did

13  apply.

14      Q    And of the sixteen that were granted the

15  early retirement in 1997, you don't know how long each

16  of those teachers worked for the Branford Board of

17  Education; do you?

18      A    I'm not sure if it's in one of the documents,

19  there is a list of all the teachers, and I don't know

20  if it breaks down the number of years in Branford, but

21  we did obtain a document from the State Retirement

22  Bureau, it gives the names and the year they retired,

23  but it does not give a breakdown of the years.

24      Q    So you don't know if any of the teachers that

25  were included in the early retirement incentive plan

91

1    in 1997, you don't know the level of seniority?

2         A    I don't.

3         Q    And, also, you don't know their ages; do you?

4         A    No, I don't.

5         Q    Okay.  And for the early retirement incentive

6    plan that was done in 2001, do you know how many

7    people applied for inclusion in that year?

8         A    I don't know for sure.  I know how many were

9    granted.

10        Q    But you don't know how many applied?

11        A    I don't know for sure.

12        Q    And you don't know the age of all those that

13   were granted the early retirement in 2001; do you?

14        A    No, I don't.

15        Q    And you don't know the level of seniority for

16   any of the teachers that were included in the early

17   retirement plan for 2001 with the Branford Board of

18   Education; do you?

19        A    No, I don't at this time.

20        Q    And is it fair to say you don't know the cost

21   saved by the Branford Board of Education concerning

22   the early retirement incentive program for 1997; do

23   you?

24        A    I don't believe I've ever seen the breakdown

25   of the costs, no.

92

1     Q     And I believe you already stated you didn't

2   know how much it would have cost the Branford Board of

3   Education to have included you in the early retirement

4   incentive program in 1999; is that correct?

5     A     I don't know the exact cost, no.

6     Q     And you were fifty years old at that time;

7   correct?

8     A     Correct.

9     Q     Do you know how the Teachers' Retirement

10   Board determines the cost for an individual to

11   purchase additional years for the retirement program?

12     A     I don't know the formula that they use, no.

13     Q     Do you know if a person's age affects the

14   cost to purchase additional years of retirement under

15   an early retirement incentive program?

16     A     I don't know for sure, but I think it does.

17     Q     The younger, the higher the cost?

18     A     I'm not positive, but I think so.

19     Q     It's your belief that the younger the person

20   is the more costly it is to purchase extra years for

21   the early retirement incentive program; correct?

22     A     Again, I don't know for a fact, but I think

23   that's right.

24     Q     Now, concerning the Branford Board of

25   Education's request to revoke your teaching

93

1    certificate, how were you denied procedural due

2    process?  I'm particularly asking how were you denied

3    by the Board of Education by Edward Struzinsky

4    concerning revocation of your teaching certificate?

5        A    I'm not sure I can answer that at this time.

6        Q    And why can't you answer that at this time?

7        A    Again, I think you're referring to that 14th

8    Amendment, which I need to review.

9        Q    So, as you sit here, did you do not know how

10    you were denied or how you claim you were denied

11    procedural due process by Edward Struzinsky or the

12    Branford Board of Education concerning the request to

13    revoke your teaching certificate that was sent in to

14    the State of Connecticut?

15        A    Right at this moment, I don't.  I would need

16    to review the 14th Amendment.  I know what happens to

17    me.  I don't know how that fits into the words you're

18    saying.

19        Q    How does that violate your procedural due

20    process, deny you procedural due process?

21        A    I'm not positive of what that particular

22    phrase means in regard to the 14th Amendment, so I

23    could tell you how I was treated, but I'm not sure

24    that that's the answer to the question you're asking.

25        Q    Well, in regards to how you were treated, how

94

1    does that treatment deny you procedural due process?

2        A    I don't know the words "procedural due

3    process."  Those are legal terms I'm not confident of,

4    and I know that there is no reason to file a request

5    to revoke without finding out what was happening in my

6    legal case.

7        Q    So you claim that the Branford Board of

8    Education should have found out what was going on in

9    your legal case before they filed the request to

10   revoke?

11       A    I feel that that knowledge, yes, well -- I

12   feel that they should not have done anything until my

13   legal case was resolved.

14       Q    And why is that?

15       A    Because we live in a country where we're

16   innocent until proven guilty, because we have laws

17   that say that we have a right to a trial by jury of

18   our peers.  Those people are the ones that legally

19   have the -- in the legal process to find in these

20   cases, and not somebody who is not part of the jury.

21       Q    And you were afforded the opportunity to put

22   your side of the story on in the revocation

23   proceedings before the State of Connecticut, correct,

24   you had multiple hearings; correct?

25       A    Yes, there were hearing dates, right.

95

1      Q    And it's your contention that because you

2  were subject to criminal charges concerning the

3  assaults that only the jury in your criminal case

4  could decide whether you were fit to hold a teaching

5  certificate?

6      A    My criminal case was about an allegation, it

7  wasn't about my teaching certificate.

8      Q    That's what I'm saying, what does the fact

9  that you had a criminal case pending have to do with

10  your teaching certificate?

11      A    Because the allegation from the criminal case

12  was what was put in the request to revoke as the

13  reason for it, and that wasn't resolved.

14      Q    And before revoking your teaching certificate

15  the State of Connecticut Department of Education

16  provided the whole process including hearings during

17  which you had the right to cross examine individuals

18  and to call individuals as witnesses; is that correct?

19      A    There was a process, yes.

20      Q    And that process included hearings; correct?

21      A    Yes, it did.

22      Q    And those hearings included the opportunity

23  for you or your representative being an attorney to

24  present evidence; correct?

25      A    Correct.

1   as guaranteed by the 14th Amendment to the United

2   States Constitution.

3                MR. MAHONEY:  Ms. Simler says she

4                doesn't understand.  Perhaps you would like

5                to rephrase it.

6   BY MR. MONASTERSKY:

7       Q    And, in fact, in paragraph 17 you claim that

8   as a direct result of the actions and admissions

9   claimed herein the plaintiff has suffered emotional

10  distress and the loss of pension benefits she is

11  otherwise entitled to and her loss of rights under due

12  process of the law and equal protection under the law.

13               Now my question to you is:  Given the

14  allegations you make in your complaint, what

15  substantive due process were you denied by Edward

16  Struzinsky and the Branford Board of Education

17  concerning revocation of your teaching certificate?

18      A    I hear your question.  I just am not prepared

19  to answer at this time.  No, I didn't intentionally

20  come here unprepared, I just am not able to answer you

21  right now.

22      Q    And how did the Branford Board of Education

23  and Edward Struzinsky deny you equal protection of the

24  law concerning the revocation of your teaching

25  certificate?

102

1        A      Again, I didn't intentionally come here

2    unprepared, but I am just not sure how to fit in what

3    I know into these categories.

4                    MR. MONASTERSKY:  Do you have a copy of

5                the discovery responses?

6                    MR. MAHONEY:   Interrogatories?

7                    MR. MONASTERSKY:  Yes, November 19th,

8                2003.  Would you give those to her, please?

9    BY MR. MONASTERSKY:

10       Q      Referring to plaintiff's response to

11   defendant's interrogatories and request for production

12   marked as Exhibit 2 in this case, drawing your

13   attention to interrogatory number 5, you were

14   specifically asked with respect to your claim for

15   denial of equal protection of the law set forth in

16   paragraphs 1 and 17 of your complaint, "Please state

17   each and every alleged action taken against you which

18   you perceive to be a violation of your rights to equal

19   protection, and for each act state the following:  A,

20   the date of the alleged act; B, the name and position

21   of the individual or individuals who carried out said

22   act; C, the name and address of all witnesses or all

23   individuals who witnessed the alleged act; D, the name

24   of each similarly situated individual who was treated

25   differently with respect to each allegation; and, D, a

1    brief description of how you were treated differently

2    than the identified similarly situated employees," and

3    in response to that you basically have a

4    two-and-a-half page response.

5         Other than what's set forth in the response

6    to the interrogatory answers, which is Exhibit A, is

7    there anything else as you sit here today that is not

8    set forth in the answer to interrogatory number 5

9    concerning your claim for denial of equal protection

10   under the law?

11       A    I'm not aware of anything at this time.

12       Q    Okay.  And do you know if any investigation

13   was undertaken by the Branford Board of Education, the

14   Branford Public Schools concerning the alleged

15   incident involving Jerry Freedman and a student?

16       A    Do I know -- I'm going to try to look at the

17   newspaper articles which talk about that.

18            (Pause.)

19       A    (Continuing.)  In one article it says that

20   Dr. Bruce Storm declined comment on the issue.  The

21   article was -- it was in the year 2000, it doesn't

22   give the specific date at the top of this.  It was cut

23   off when it was copied.

24       Q    Let me ask you a question:  Does all your

25   knowledge concerning the events surrounding Jerry

1   Freedman and his incident with the student come from

2   newspaper articles?

3       A    At the present time, yes.

4       Q    Do you know if Mr. Freedman was ever

5   investigated by the Branford Public Schools or the

6   Branford Board of Education concerning the alleged

7   incident with a student?

8       A    I do not know for a fact that he was.

9       Q    You don't know either way?

10      A    Right; I don't know either way.

11      Q    Do you know if Mr. Freedman was placed on

12  paid administrative leave following his arrest?

13      A    I don't know either way.

14      Q    Okay.  Do you know if Mr. Freedman was

15  disciplined at all by the Branford Board of Education

16  concerning the incident with the student which you

17  referred to in your response in interrogatory number

18  5?

19      A    I don't know if he was.

20      Q    Okay.  And concerning Mr. Harold Vonhoff, do

21  you know if he was placed on paid administrative leave

22  following his arrest on drug charges?

23      A    I know that that was stated in the newspaper.

24      Q    Do you know if the Branford Board of

25  Education was investigating the circumstances

105

1    surrounding his arrest?

2        A    I believe it was implied in the comments in

3    the newspaper both by Dr. Storm and the chairman of

4    the Board of Education, Catherine Jackson.

5        Q    Do you know if the Branford Board of

6    Education ever had the opportunity to complete its

7    investigation of Harold Vonhoff concerning the

8    allegation of drug charges?

9        A    I don't know if they did.

10       Q    Okay.  And if in fact Mr. Vonhoff was fired,

11   terminated by the Branford Board of Education;

12   correct?

13       A    According to an article he was fired because

14   of a certification issue, but not because of the

15   arrest.

16       Q    In fact, he was fired because he let his

17   certification lapse?

18       A    I don't know that for a fact.  It didn't say

19   that in the newspaper.

20       Q    I know that for a fact.  Are you aware that a

21   teacher in the Branford Public Schools Board of

22   Education can be automatically or immediately

23   terminated for failure to maintain the appropriate

24   certification?

25       A    I don't know for a fact, but it sounds like

106

1    it could be true.

2        Q    In fact, wasn't that part of the collective

3    bargaining agreement between the Branford Board of

4    Education, the Branford Education Association for the

5    years July 1, 1997, through June 30th, 2000?

6        A    I don't have the document in front of me, but

7    if it's possible it's in there.

8                    MR. MONASTERSKY:  Could I have that

9            marked as an exhibit, please?

10                   (Defendants' Exhibit 16:  Marked for

11           identification.)

12       A    It says here that if the teacher cannot show

13   evidence of proper certification, the Board of

14   Education contracts may be automatically terminated

15   and further payments withheld so --

16   BY MR. MONASTERSKY:

17       Q    And on a State statute teachers have to be

18   properly certified in order to teach for public

19   schools, to hold a full-time teaching position; is

20   that correct?

21       A    That has always been my understanding,

22   however, I know that there are times when teachers

23   have temporary certificates and sometimes they hire

24   teachers who aren't certified as what they call

25   long-term subs, but they could actually be there for a

107

1   whole school year, so there are some -- I know there

2   are some issues in that area.

3       Q    I'm saying for a full-time teaching position,

4   the State statutes are very clear that you have to

5   hold proper certification.  They do make exceptions

6   for long-term subs for temporary teaching, but not for

7   full-time teaching positions?

8       A    It's my understanding that that's true, but I

9   know that there have been times even when the State

10  Board of Education has made some exceptions because

11  there were shortages in positions, that sort of thing.

12      Q    You're talking about temporary durational

13  shortage certification?

14      A    That might be the term.  I wasn't sure.

15      Q    But that's a certification that they issue on

16  a temporary basis; correct?

17      A    I never really, you know, gotten into a lot

18  of -- I kind of read about it and heard about it, but

19  I think that's the case.

20      Q    At the time Mr. Vonhoff was terminated from

21  the Branford Board of Education you do not know if it

22  had the opportunity to complete its investigation into

23  the accusations against him; is that correct?

24      A    I don't know if they had the time.

25      Q    Now, the discovery responses, we'll look at

1    those again.  Other than what's set forth in your

2    response to interrogatory number 5, I just want to

3    make this clear, you have no other evidence concerning

4    your claim for denial of equal protection in this

5    case?

6        A    At this present time, I don't.

7        Q    Now interrogatory number 6 says with respect

8    to your claim for denial procedural due process set

9    forth in paragraphs 1 and 17 of your complaint, "State

10   the alleged property right that entitled you to due

11   process, the manner in which due process was allegedly

12   denied and what procedural due process you claim you

13   were entitled."  And other than the response you gave

14   there, do you have any other evidence concerning your

15   denial of due process, the property right entitled to

16   due process, the manner in which you were denied, and

17   what process you claim you were entitled to?

18       A    Not at this time, no.

19       Q    Other than what's set north in that answer?

20       A    Other than what's set forth here right now,

21   not at this time.

22       Q    Okay.  And concerning your claimed alleged

23   denial, and you were asked to identify the name and

24   position of each individual who allegedly denied you

25   due process and the date of the denial in

109

1    interrogatory 7.  Other than what's been set forth in

2    the answer to interrogatory 7, which is actually 15 in

3    this case, do you have any other evidence that would

4    be responsive to interrogatory number 7?

5        A    Not at this time.

6        Q    Okay.  I'll give this to you after I read it.

7    Paragraph 11 of the complaint states, "After she

8    retired and after the Board learned of her decision to

9    litigate the issue of her exclusion from the

10   retirement plan, the Board authorized and

11   Mr. Struzinsky effectuated a scheme to have the State

12   Board of Education revoke the plaintiff's teaching

13   license upon information and belief the defendants

14   acted in such a manner out of belief and hope that if

15   the teacher's license were revoked they would be

16   ineligible for participation in the retirement plan."

17            My question to you is:  What evidence do you

18   have to support the contention that they took the

19   action that is alleged in paragraph 11 on the belief

20   that you would be ineligible to participate in the

21   retirement plan?

22       A    I don't have any evidence at this time

23   specifically for this.  The things that I have given

24   in terms of the other documents supporting that I

25   applied for the Ohio Retirement Plan and was excluded

Niziankewicz & Miller Reporting Service
972 Tolland Street
East Hartford, CT 06108
(860) 291-9191

110

1    I have at this time, but I don't have anything else to

2    offer right at this moment.

3        Q    You don't have any evidence that the

4    motivation for the request to revoke your teaching

5    certificate was upon the belief that you would be

6    ineligible to participate in a retirement plan?

7        A    I don't have that evidence right at the

8    moment, no.

9        Q    Do you have any evidence that anyone from the

10   Branford Board of Education, Branford Public Schools

11   or any of its employees ever contacted the Teacher

12   Retirement Board indicating that it was their belief

13   that you would be ineligible for participation in any

14   retirement plan if your teaching certificate was

15   revoked?

16       A    At this time I don't have any knowledge or

17   any evidence that anyone contacted the retirement

18   board.

19       Q    In fact, you are receiving your retirement

20   benefits, correct, your normal retirement benefits?

21       A    I am.

22       Q    And as far as you know, has the Branford

23   Board of Education, Branford Public Schools or any of

24   its employees attempted to interfere with your receipt

25   of your normal retirement benefits?

1     A     I'm not aware of anyone trying to do that.

2     Q     Okay.  And you had no evidence that the

3   Branford Board of Education, the Branford Public

4   Schools or any of its employees had contacted the

5   Teacher Retirement Board claiming that you are

6   ineligible for your normal retirement benefits as a

7   result of the revocation of your teaching certificate;

8   is that correct?

9     A     I am not aware that anyone has contacted the

10  Board.

11    Q     So, in fact, you don't have any evidence of

12  the motivation of the Branford Board of Education or

13  Edward Struzinsky concerning the request for

14  revocation of your teaching certificate made to the

15  State of Connecticut; is that correct?

16              THE WITNESS:  May I have the question

17         read?

18              (The last question was read by the Court

19         Reporter.)

20              MR. MAHONEY:  I'm going to object to the

21         form, but you can answer.

22    A     I'm trying to make sure I understand the

23  question.  I'm not sure I understand the question.

24  BY MR. MONASTERSKY:

25    Q     Let me ask you this way:  You don't have any

1    evidence, you say that the Branford Board of Education

2    acted through Mr. Struzinsky in a scheme to effectuate

3    the revocation of your teaching license upon the

4    belief and hope that you would be ineligible to

5    participate in the retirement plan; is that correct?

6                MR. MAHONEY:  I'm going to object to the

7            form.  You can answer.

8        A    At this moment I have to say I don't believe

9    I do.

10   BY MR. MONASTERSKY:

11       Q    Okay.  Paragraph 16 in your complaint says,

12   "The actions of each of the defendants were

13   intentional and inspired by malice."  Concerning your

14   claim for revocation of your teaching certificate,

15   what evidence do you have that the actions revoking

16   your teaching certificate were inspired by malice that

17   was taken by Mr. Struzinsky and the Branford Board of

18   Education?

19       A    It's my feeling that this action was taken

20   against me and only against me when there have been

21   other teachers who have had -- who have been arrested

22   and had other things happen, and these -- this action

23   of the request to revoke was not taken against them.

24   I feel that that is part of the evidence of it being

25   intentional and malicious toward me.